UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROOSEVELT ROAD RE, LTD. and TRADESMAN PROGRAM MANAGERS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> HERBERT S. SUBIN, ERIC D. SUBIN, JORGE ARTURO GONZALEZ LUPI, and JOHN DOES 1-50, <br><br> Defendants. | **MEMORANDUM & ORDER** <br> 24-CV-05033 (HG) |

**HECTOR GONZALEZ**, United States District Judge:

Plaintiffs Roosevelt Road Re, Ltd. and Tradesman Program Managers, LLC, have sued Herbert S. Subin, Eric D. Subin, Jorge Arturo Gonzalez Lupi (together, the "Moving Defendants"), and various unidentified Defendants, primarily alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. Plaintiffs allege that Defendants engaged in a scheme by which they used a law firm to direct construction workers to stage worksite injuries, inflated the value of these claimants' cases by referring them for unnecessary medical procedures, and obtained money through fraudulent judgments, settlements, and workers' compensation payments. That scheme allegedly injured Plaintiffs because Roosevelt, a reinsurer, needed to pay out on bogus claims covered by primary insurers, and Tradesman, a claim administrator, managed payments for these claims and was required to perform investigative and support work to process them. For the reasons explained below, Plaintiffs' RICO claims fail because they fail to adequately plead cognizable, direct injuries, and the Amended Complaint is dismissed. Additionally, the Court declines to impose sanctions on Lupi and his counsel.

## BACKGROUND[1]

Plaintiff Roosevelt is a Bermudian reinsurer and Plaintiff Tradesman is a New York company that acts as a "management general agency" providing services to various insurers and reinsurers, including Roosevelt. *See* ECF No. 26 ¶¶ 3–4, 56, 66 (Am. Compl.; "AC"). Defendants Herbert Subin and Eric Subin are attorneys and part owners of Subin Associates, LLC, a law firm (the "Subin Firm"). *Id.* ¶¶ 5–6.

As part of a scheme, so-called "runners," "under the direction of and in coordination with Defendants," recruited construction workers into staging fake accidents at construction sites. *Id.* ¶ 11. Defendant Lupi was one such runner. *Id.* ¶¶ 7, 19. The runners directed the construction workers to claim that these sham accidents caused bodily injury and to seek medical treatment. *Id.* ¶ 12. The runners then "referred and/or transported" these construction worker claimants to the Subin Firm, which represented claimants in connection with lawsuits against parties involved with the construction projects. *Id.* ¶¶ 13–14. The Subin Firm earned a percentage of the ultimate judgment or settlement in these cases. *Id.* ¶ 22. Usually in addition to filing lawsuits, the Subin Firm referred claimants to other law firms, which filed workers' compensation claims for these claimants. *Id.* ¶¶ 15–16. These referrals allowed the Subin Firm to "maintain[] control" over claimants' medical treatment, *id.* ¶ 23, although the AC does not specify how Defendants otherwise benefited from these referrals. The runners and the Subin Firm also directed claimants to certain medical providers. *Id.* ¶ 17. In exchange for a stream of referrals, the medical providers provided false medical documentation to inflate claim values. *Id.* ¶ 18.

---

[1] The Court "recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021). Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted. The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

Since 2018, the Subin Firm has been involved in thousands of lawsuits related to construction work paired with related workers' compensation claims. *Id.* ¶ 29. The AC contains several examples of how Defendants put the alleged scheme into action. *See id.* ¶ 38. One is illustrative. Around December 5, 2019, Lupi introduced "Claimant A" to Herbert Subin. *Id.* ¶ 38a. Lupi and Herbert Subin referred Claimant A to another law firm around March 2020, as well as to various medical providers for treatment purportedly attributable to a construction site accident. *Id.* The Subin Firm and Lupi assisted Claimant A in undergoing unnecessary diagnostic and medical treatment, including surgeries performed in September 2020. *Id.* To carry this out, Defendants used telephone calls, texts, email, and the mail. *Id.* In November 2020, at the direction of one or both of the Subin Defendants, a verified bill of particulars was sent via the mail to defense counsel in Claimant A's underlying lawsuit. *Id.* ¶ 38b. Later, additional bills of particulars were also sent. *Id.* ¶¶ 38h, k. Eventually, a defendant in the underlying lawsuit moved to assert fraud, after which the Subin Firm moved to withdraw and filed a consent to change counsel. *Id.* ¶ 45a. The AC does not specify how the Subin Firm benefitted from its referral of Claimant A to another firm, when it began representing Claimant A, or how it benefited from that representation.

At the end of 2023 and start of 2024, another reinsurer sent letters to the Subin Firm complaining about "a significant increase in claims" brought under New York's Scaffold Law. *Id.* ¶¶ 41–42. The latter letter claimed that, according to the reinsurer's records, "the highest number of suspected fraudulent cases seem to originate from" the Subin Firm. *Id.* ¶ 42. In addition, another lawsuit against different defendants alleging conduct similar to that alleged in this action was filed in this District on March 1, 2024. *Id.* ¶ 43. In light of the foregoing, the Subin Firm sought to withdraw from many cases, including in Claimant A's case. *Id.* ¶¶ 44–45a.

Plaintiffs initiated this action on July 19, 2024, *see* ECF No. 1, and the AC was filed on November 26, 2024, *see* ECF No. 26.  Herbert Subin filed his motion to dismiss on January 6, 2025.  *See* ECF No. 36 (Mot.); ECF No. 36–1 (Mem.).  Lupi filed his motion to dismiss the next day.  *See* ECF No. 37.  Eric Subin then appeared in the action and joined Herbert Subin's motion.  *See* ECF No. 41 (Mot.); ECF No. 41-1 (Mem.).  On February 5, 2025, Plaintiffs filed oppositions to the Subins' motions, *see* ECF No. 46, and Lupi's motion, *see* ECF No. 47.  On March 5, 2025, the Subins filed their joint reply, *see* ECF No. 49, and Lupi also filed his reply, *see* ECF No. 50.[2]

## LEGAL STANDARD

"In order to survive a motion to dismiss, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "In making this assessment, the court must accept as true all of the factual allegations set out in plaintiffs['] complaint, draw inferences from those allegations in the light most favorable to plaintiff[s], and construe the complaint liberally."  *VR Glob. Partners, L.P. v. Petróleos de Venezuela, S.A.*, No. 24-1176-cv, 2024 WL 4891271, at *2 (2d Cir. Nov. 26, 2024).

---

[2]   Lupi's papers are materially indistinguishable from Herbert Subin's.  *See infra* § VI.  Therefore, for the sake of readability, the Court cites only to Herbert Subin's papers.  Plaintiffs also ask the Court to disregard arguments raised by Lupi in his motion that were not first raised in his pre-motion letter.  *See* ECF No. 47 at 12.  The Court need not address that argument because Lupi's pre-motion letter raised the dispositive issue of injury discussed below.  *See* ECF No. 18 at 3.

**DISCUSSION**

Plaintiffs assert four claims against all Defendants: (i) a substantive RICO violation, 18 U.S.C. § 1962(c); (ii) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (iii) common law fraud; and (iv) unjust enrichment. Additionally, Plaintiffs seek declaratory relief. Moving Defendants move to dismiss all claims.

**I.     Substantive RICO**

Under Section 1964(c), "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . may sue." "To state a civil RICO violation under 18 U.S.C[.] § 1962(c), 'a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Compton v. Pavone*, No. 21-931, 2022 WL 1039966, at *1 (2d Cir. Apr. 7, 2022) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). Defendants raises challenges on several fronts, but their first contention concerning Plaintiffs' alleged injuries is dispositive.

Moving Defendants assert that Plaintiffs "lack standing to assert a RICO cause of action" because they fail to adequately plead causation. ECF No. 36-1 at 11.[3] As the Supreme Court just recently reemphasized, a RICO claim contains a "direct-relationship requirement." *Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 945 (2025). Specifically, "[Section] 1964(c)'s 'by reason of' language demands 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). Thus, a plaintiff "is required to show that a RICO predicate offense 'not only was a "but for"

---

[3]     The parties refer to causation as a "standing" requirement. *See* ECF No. 36-1 at 11; ECF No. 46 at 14–15. For the avoidance of doubt, the Court observes that they are referring to so-called "statutory standing" under RICO. *See Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003). Defendants do not raise a challenge to Plaintiffs' Article III standing necessary for the invocation of this Court's limited subject-matter jurisdiction. *See Edmonson v. Raniere*, 751 F. Supp. 3d 136, 173 (E.D.N.Y. 2024) ("RICO standing is not jurisdictional, but it is a more rigorous matter than standing under Article III.").

cause of his injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 268). Accordingly, "whenever the plaintiff's theory of causation requires moving 'well beyond the first step,' it 'cannot meet RICO's direct relationship requirement.'" *Horn*, 145 S. Ct. at 945 (quoting *Hemi*, 559 U.S. at 10).

Several Supreme Court cases illustrate the force of the proximate cause limitation. In *Anza v. Ideal Steel Supply Co.*, plaintiff brought a RICO claim against competitors, the Anzas, alleging that they failed to charge sales tax on cash-paying customers. 547 U.S. 451, 454 (2006). That practice permitted the Anzas to preserve margins without reducing price, therefore undercutting plaintiff's pricing power. *Id.* 454–55. To conceal this conduct, the Anzas allegedly submitted fraudulent tax returns to New York State. *Id.* at 454. The Supreme Court held such a causation theory failed because "the direct victim of [the Anzas'] conduct was the State of New York, not [plaintiff]" given that "[i]t was the State that was being defrauded and the State that lost tax revenue as a result." *Id.* at 458. Even though plaintiff experienced losses because of the fraud scheme, "[t]he cause of [its] asserted harms . . . [was] a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.*

Similarly, in *Hemi*, New York City sued Hemi, an out-of-state cigarette seller, because Hemi did not file sales information with New York State's tobacco authority. 559 U.S. at 5–6. As a result, the state authority did not forward sales information to the City, which the City needed to assess taxes on cigarettes sold by Hemi to City residents who did not themselves pay the required taxes. *Id.* The Supreme Court ruled that that theory was "far too indirect," requiring the Court to "move well beyond the first step" of injuries. *Id.* at 10. As in *Anza*, the City's causation theory failed because "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes. And the conduct constituting the alleged fraud was Hemi's failure to file" reports with the state tobacco authority. *Id.* at 11.

6

Both *Anza* and *Hemi* relied on the earlier, foundational case of *Holmes*, where the Court confronted, but still rejected, a shorter causation chain. *See Hemi*, 559 U.S. at 9. In *Holmes*, the Securities Investor Protection Corporation, or SIPC, brought a RICO case against Holmes, alleging that he participated in a stock manipulation scheme that resulted in two broker-dealers going under, requiring SIPC's intervention to cover the claims of the brokerages' customers who did not purchase the manipulated securities. 503 U.S. at 262–63, 270. The Supreme Court rejected that theory, too, reasoning that "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271.

Picking up on this line of authority, Moving Defendants assert that Tradesman fails to plead causation because "it suffered no injury directly from any alleged predicate acts." *See* ECF No. 36-1 at 12–14. They make the same argument with respect to Roosevelt. *See id.* at 14–16. The Court discusses each Plaintiff's alleged injuries in turn.

### A. Tradesman

Defendants say that Tradesman's asserted injuries are not directly attributable to the alleged fraud scheme. *See id.* at 12. To contextualize this argument, it is helpful to focus on how the AC characterizes Tradesman. Unfortunately, the AC is no model of clarity on this point. However, there is one description tucked into the AC:

> Tradesman serves as a management general agency that provides management services to various insurers and reinsurers, including Plaintiff Roosevelt, including general liability and workers' compensation services from underwriting through claims handling and subsequent administrative and legal actions, specifically focusing on safety management and effective handling of claims within the construction industry.

AC ¶ 66. Construing the AC liberally, Tradesman appears to provide claims services to insurers. Furthermore, the AC states, apparently with respect to workers' compensation claims only, that Tradesman is under a "statutory obligation to promptly and fairly pay or object to bills received

7

within 45 days," *id.* ¶ 53, and "relied on [false documentation from the fraud scheme] to direct payment on dozens of claims," *id.* ¶¶ 54–55.  It alleges to have experienced damages "incurred for the administration of these claims and the retention of additional staff to perform investigative and support services for claims wherein the Defendants are submitting or causing to be submitted claims/demands for monetary payments in connection with New York's [Workers'] Compensation Law and New York's Labor Laws." *Id.* ¶ 69b.

In light of the foregoing, the Court agrees with Moving Defendants that Tradesman cannot sustain this claim under RICO.  Although cast in terms of "causation," Moving Defendants' argument is more fundamental, and implicates whether Tradesman has sufficiently alleged a cognizable RICO injury in the first place.  Under RICO, Tradesman must have been the "intended target[] of the RICO violation[]." *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994); *accord J.T. v. de Blasio*, 500 F. Supp. 3d 137, 166 (S.D.N.Y. 2020), *aff'd in relevant part sub. nom.*, *K.M. v. Adams*, No. 20-4128, 2022 WL 4352040, at *3 (2d Cir. Aug. 31, 2022).  But, by Tradesman's own account, it was no such target.  As alleged, Defendants directed claimants to stage accidents and incur unnecessary medical expenses for the purposes of filing "general liability lawsuits . . . against the various parties involved with the construction project (*e.g.*, owner, general contractor, construction manager, etc.)" or workers' compensation claims "to the New York State Workers' Compensation Board." AC ¶¶ 14–15.  Tradesman apparently became involved by helping insurers to service those claims and "diect[ing] payment" on at least some of them.  *See id.* ¶¶ 53–54, 69b; *see also* ECF No. 46 at 16 (arguing, without reference to the AC, that "Tradesman makes recommendations regarding the payment of claims and settlement of lawsuits to insurers and reinsurers").

The AC alleges no flow of money from Tradesman to Defendants.  Rather, Tradesman vaguely asserts that it "made substantial payments and sustained significant damage in

8

connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme." *Id.* ¶ 67. No reading of those allegations permits the conclusion that injuries like its increased administrative and investigation costs were the "preconceived purpose" or the "specifically-intended consequence" of Defendants' conduct. *In re Am. Express*, 39 F.3d at 400. Indeed, the Second Circuit has explained that costs stemming from an investigation into an enterprise's conduct are insufficiently direct because they "are the costs of [plaintiff]'s acts, not the defendants' RICO violations." *Hollander v. Flash Dancers Topless Club*, 173 F. App'x 15, 17 (2d Cir. 2006). Thus, because Tradesman's "alleged injury is the derivative result of a fraudulent scheme" targeting construction employers or perhaps the Workers' Compensation Board, it falls outside of RICO's remit, requiring dismissal. *See J.T.*, 500 F. Supp. 3d at 166.

Tradesman's lack of cognizable RICO injury is also undermined by the fact that its theory appears to defy economic logic. *See Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 283 (S.D.N.Y. 2019) ("[C]ounterfactual reasoning at the pleadings stage is appropriate in the RICO context."). Again, Tradesman complains that it was required to spend money administering and investigating bogus claims. *See* AC ¶¶ 67, 69b. But, by Tradesman's own account, it is in the business of sorting the wheat from the chaff in that way, and its insurer and reinsurer customers presumably pay it for that work. *See id.* ¶ 66. Thus, it is notable that Tradesman never alleges that the excess costs of investigating fraudulent claims exceeded the money it made from processing them. Consider a group of kids who decided to start throwing rocks at cars, breaking their windows. Perhaps the local mechanic would be irked by the projectiles flying around the neighborhood, but one would find it odd if he faulted the kids for the cost of the glass he needed to buy all while delivering substantial invoices to his new customers. Accordingly, it is unsurprising that Tradesman points to no authority concluding that an administrative

9

intermediary like it suffers a RICO injury when a fraudster targets one of its customers. *Cf. Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999) (dismissing RICO claims by insurers against tobacco companies for harms to plan members caused by smoking-related diseases because harms to "plaintiff's infrastructure, financial stability, and ability to project costs" were too attenuated).

In any case, even assuming that the AC plausibly alleges that Tradesman suffered a cognizable injury, the Court must look "well beyond the first step" to locate it. *Hemi*, 559 U.S. at 10. Once again, Defendants allegedly directed construction workers to fake accidents and fraudulently inflate the size of their claims so that expensive litigation could be initiated against their construction employers. *See* AC ¶¶ 14–15. Those employers, now confronted with lawsuits and/or workers' compensation claims, apparently contacted their insurers. Then, those insurers contacted Tradesman, who processed and investigated the claims for the insurers. *See id.* ¶ 66. In doing so, Tradesman spent money. *See id.* ¶ 67. But if SIPC was unable to adequately plead causation against the defendant in *Holmes* because "the link [was] too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers," 503 U.S. at 271, then Tradesman's claim here must similarly fail because it is contingent on harms suffered by insurers, which are themselves contingent on the harms suffered by the construction employers. In the Court's view, Tradesman shows its hand when it ultimately alleges that construction insurance frauds are causing premia to rise, resulting in "numerous insurance carriers . . ceas[ing] to write Workers' Compensation and/or general liability policies in . . . New York, which has resulted in damage to Tradesman's business." AC ¶ 68. But to find that causation chain plausibly pled would be to engage in an "'intricate, uncertain inquir[y]' into the extent of [Defendants'] responsibility for the loss," a mode of analysis foreclosed by Supreme Court precedent. *See In re Tether & Bitfinex Crypto*

10

*Asset Litig.*, 576 F. Supp. 3d 55, 116 (S.D.N.Y. 2021) (quoting *Anza*, 547 U.S. at 460)). After all, Tradesman isolates not one case in which it can draw a line between a fraudulent claim and its ultimate payment. For these reasons, Tradesman's substantive RICO claim fails on the injury element, and the Court dismisses it.

## B. Roosevelt

Roosevelt's RICO claim also falters. As with Tradesman, Moving Defendants raise an attenuation issue with respect to Roosevelt's alleged injuries. *See* ECF No. 36-1 at 15–16. But also like Tradesman, Roosevelt makes rather unclear allegations about the nature of its business and thus, its injuries. Roosevelt is "a reinsurer which underwrites policies and provides reinsurance that covers the various workers' compensation claims and personal injury lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme." AC ¶ 56. It "has incurred expenses paid as reimbursement to primary insurers providing coverage for the claims and lawsuits filed and/or prosecuted by the Legal Defendants on behalf of Claimants." *Id.* ¶ 57. In sum, "Roosevelt has incurred general liability claim adjustment expenses progressively rising" over several years, and its "net outstanding liability under general liability reinsurance increased" by nearly 47% between 2021 and 2022. *Id.* ¶¶ 59–60. It has made "mandatory reimbursement for payments made directly to the Subin Firm, medical providers, or to others due to Defendants' pattern of fraudulent conduct in connection with claims made under New York's Workers' Compensation Laws and New York's Labor Laws." *Id.* ¶ 69a.

Roosevelt's alleged RICO injuries are too attenuated to survive dismissal. As a reinsurer, its injuries are definitionally "[m]ultiple steps" away from the alleged fraud. *Hemi*, 559 U.S. at 15. Tellingly, in its Opposition, Roosevelt points to no case finding that a reinsurer sufficiently alleged a direct causation chain under RICO. To be sure, insurers may clear the proximate case hurdle when they are the targets of the fraud. *See, e.g.*, *GEICO v. Landow*, No. 21-cv-1440,

11

2022 WL 939717, at *1, *6–7 (E.D.N.Y. Mar. 29, 2022) (insurer sufficiently alleged causation where it alleged that medical provider defendants took advantage of New York's no-fault laws by submitting fraudulent bills to it).  That's plainly not the case here.  According to Roosevelt, it "was required to reimburse insurers for the payments they made" and "[a]s a result, Roosevelt was the entity (not the primary insurers) that absorbed the financial impact from the payments made by insurers for workers' compensation claims and/or the general liability claims."  *See* ECF No. 46 at 20.  But that just makes clear that Roosevelt sustained an injury "derivative of an injury to a third party."  *See Laborers Loc. 17*, 191 F.3d at 238–39.

Significantly, Roosevelt fails to explain how its injury—a contractually required payment to a primary insurer—was directly caused by the fraud, rather than, for example, the construction employer's decision to seek coverage or the primary insurer's decision to settle the claim.  *See Hemi*, 559 U.S. at 15 (finding insufficient proximate causation where "[t]he City's theory of liability rest[ed] on the independent actions of third and even fourth parties").  It is differently situated from the insurer in its best case, *Allstate Insurance Co. v. Seigel*, in which the court found causation adequately pled under RICO where the defendant created false claims for unnecessary or nonexistent medical procedures paid out by Allstate, either directly or in the form of inflated judgments and settlements.  312 F. Supp. 2d 260, 263, 266–67 (D. Conn. 2004).  Indeed, Roosevelt looks a lot like SIPC in *Holmes*.  Just as the directly injured parties in that case were the brokerages, the directly injured parties here are the construction employers faced with fraudulent lawsuits.  *See* 503 U.S. at 271.  When those brokerages went bust, their customers were harmed; here, too, because the construction employers were sued, the primary insurers faced losses.  *See id.*  Ultimately, SIPC, which had statutory obligations to brokerage customers analogous to Roosevelt's contractual obligations to primary insurers, could not bring a RICO claim against the defendant because "the link [was] too remote between the stock manipulation

12

alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *See id.* at 261–62, 271.  That rationale compels the same conclusion here, and perhaps more so, as the harm to Roosevelt is doubly contingent on the losses to the construction employers and their insurers.  So, as *Anza*, *Hemi*, and *Holmes* all make clear, a party like Roosevelt may not sue under RICO merely because it ultimately "absorb[s] the financial impact" of the fraud experienced by others.

Alternatively, Roosevelt claims that it experienced a direct injury "in the form of the unnecessary legal fees paid in defending the fraudulent workers' compensation claims and personal injury lawsuits."  ECF No. 46 at 20.  Roosevelt is right to observe that legal fees can sometimes constitute cognizable injuries under RICO.  *See Angermeir v. Cohen*, 14 F. Supp. 3d 134, 152–53 (S.D.N.Y. 2014) (collecting cases).  The problem for it is that in those cases, the injured RICO plaintiff which incurred the fees was the target of the "frivolous lawsuits."  *See, e.g.*, *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1099 (2d Cir. 1988).  That is not the case here.  Rather, Roosevelt alleges:

> But for Defendants' perpetration of the Fraud Scheme, Roosevelt's expenses paid as reimbursement to primary insurers would be less because the Claimants' injuries, if any, would be less severe and the medical services necessary to treat any accident-related injury, if any, would [sic] less significant, resulting in lower settlement value of such claims and lawsuits and thus, less litigation expenses.

AC ¶ 58.  Thus, Roosevelt's argument really collapses into a remix of the argument just rejected, and further highlights the attenuated nature of its injury.  Because construction employers faced unnecessary legal fees, their insurers had to pay out larger claims, which also dented reinsurers' coffers.  That kind of downstream, market-wide injury is insufficiently direct to withstand dismissal.  *See 7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 771 F. App'x 498, 504 (2d Cir. 2019) (affirming dismissal of civil RICO claim based on alleged manipulation of LIBOR on proximate cause grounds where "the injury was directly caused by buy/sell decisions that independent

13

market actors made, which LIBOR may have influenced"). Roosevelt's substantive RICO claim is dismissed.

### C. Conclusion

Moving Defendants present extensive additional argument in favor of dismissal of the substantive RICO counts, including, for example, failure to adequately plead predicate acts. *See* ECF No. 36-1 at 16–29. However, in light of the above analysis, the Court need go no further. *See Horn*, 145 S. Ct. at 945 (describing "RICO's direct-relationship requirement" as the "[f]irst and foremost" "constraint[]" on these claims). Undoubtedly, the AC paints a picture of a troubling fraud, but not every fraud, even if large and successful, sounds in RICO. For the reasons just stated, Count I, alleging a substantive RICO violation, is dismissed in its entirety.

## II. RICO Conspiracy

Moving Defendants argue that Count II, alleging a RICO conspiracy pursuant to Section 1962(d), should be dismissed, among other reasons, due to the failure of the substantive RICO count. *See* ECF No. 36-1 at 29. Plaintiffs of course contest whether their substantive claim fails, but concede that if the substantive claim fails, the conspiracy count must also fall. *See* ECF No. 46 at 31. Plaintiffs have therefore abandoned any claim seeking to separate the viability of their substantive RICO claim from their RICO conspiracy claim. *See Felix v. City of New York*, 344 F. Supp. 3d 644, 654–55 (S.D.N.Y. 2018). In any event, Defendants' argument is substantively meritorious. "In the absence of any viable underlying 18 U.S.C. § 1962(c) claim, plaintiffs' RICO conspiracy claim pursuant to 18 U.S.C. § 1962(d) must also fail." *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 424 (E.D.N.Y. 2017) (Bianco, J.) (citing, *inter alia*, *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004)). The Court therefore need not address Defendants' alternative arguments for dismissal, and Count II, alleging a RICO conspiracy, is also dismissed.

### III. State Law Claims

In Counts III and IV, Plaintiffs also bring state law claims for fraud and unjust enrichment. *See* AC ¶¶ 80–98. As a threshold matter, Defendants urge the Court not to exercise supplemental jurisdiction over these claims in light of the dismissal of the federal RICO claims. *See* ECF No. 36-1 at 30–31. The only two bases for subject-matter jurisdiction in this case are federal-question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. *See* AC ¶ 1. Accordingly, Counts III and IV depend on the Court's exercise of supplemental jurisdiction. Pursuant to 28 U.S.C. § 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction if," as here, "it has dismissed all claims over which it has original jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). Ordinarily, a court's resolution of all the claims over which it has original jurisdiction before trial "generally points to declining to exercise supplemental jurisdiction" over any remaining claims. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 86 (2d Cir. 2018). In considering the "traditional values of judicial economy, convenience, fairness, and comity," the Court declines to exercise supplemental jurisdiction in this case. *See Kolari*, 455 F.3d at 122. Plaintiffs do not address any of these factors. *See* ECF No. 46 at 32. And applying the general rule makes sense in this case. This case, filed less than a year ago and at the motion to dismiss phase, is in its "early stages." *See Sehgal v. Aggarwal*, No. 20-cv-4577, 2021 WL 3617479, at *6 (E.D.N.Y. Aug. 16, 2021) (declining to exercise supplemental jurisdiction over state law claims following dismissal of federal RICO claim). Discovery is ongoing, with fact discovery open until September 30, 2025, and expert discovery running through the end of the year. *See* ECF No. 31; *First Cap.*, 385 F.3d at 182–83 (affirming district court's decision declining to exercise supplemental jurisdiction where dismissal of federal RICO claims took place "well before trial"

and "before significant discovery had taken place"). Therefore, the Court dismisses Counts III and IV without prejudice.

### IV. Declaratory Relief

Moving Defendants argue that the claim for declaratory relief must be dismissed following the dismissal of the substantive causes of action. *See* ECF No. 36-1 at 33. That argument has merit. Because "the Declaratory Judgment Act does not by itself confer subject matter jurisdiction on the federal courts," "there must be an independent basis of jurisdiction before a district court may issue a declaratory judgment." *Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767, 769 (2d Cir. 2006). Again, Plaintiffs do not claim that such a basis exists. *See* ECF No. 46 at 35. The Court therefore dismisses Plaintiffs' claim for declaratory relief without prejudice.

### V. Leave to Amend

Plaintiffs request that "to the extent that the pleading of additional facts are necessary to correct any deficiencies in the []AC, [they] can amend the []AC at the Court's request to address those deficiencies." *See* ECF No. 46 at 35. Defendants do not address amendment in reply. As an initial matter, Plaintiffs' perfunctory request does not entitle them to leave to amend. *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011) (finding no abuse of discretion in denying leave to amend where the "plaintiffs requested leave to amend without specifying what additional facts, if any, they might assert in a new pleading"); *Singh v. Schikan*, No. 14-cv-5450, 2015 WL 4111344, at *1 (S.D.N.Y. June 25, 2015) (describing denial of leave to amend based on a "one[-]sentence, boilerplate request"). Nevertheless, the Court is cognizant that the Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal

16

of a complaint under Rule 12(b)(6)." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (affirming denial of leave to amend).

"A court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (affirming denial of leave to amend). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 175 (2d Cir. 2021). In view of these standards, this case presents a close call. For one, these exact issues regarding injury and causation were raised at the pre-motion stage, after which Plaintiffs amended. *See* ECF No. 17 at 1; ECF No. 18 at 3. Of course, the mere fact of amendment after seeing the pre-motion letters does not mean that Plaintiffs "forfeit[ed] the opportunity to replead." *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Nevertheless, this history leaves the Court skeptical that these issues can be cured. That is particularly so here. The problems with injury do not appear to stem from mere pleading deficiencies that can be fixed with additional facts but rather from Plaintiffs' commercial positions vis-à-vis Defendants, rendering them "substantive" (and thus making amendment futile). *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). However, the Second Circuit has cautioned that when a "case combines a complex commercial reality with a long, multi-prong complaint," as here, "pleading defects may not only be latent, and easily missed or misperceived without full briefing and judicial resolution" or at least "borderline, and hence subject to reasonable dispute." *See Loreley*, 797 F.3d at 191. Accordingly, even though

amendment will probably be futile, the Court grants Plaintiffs leave to replead out of an abundance of caution.

## VI. Sanctions

There is one separate matter to attend to. The Court previously ordered Lupi's counsel to show cause why he and/or his client should not be sanctioned. *See* June 13, 2025, Order to Show Cause. The Court observed that Lupi's counsel appeared to copy and paste from his co-Defendants' briefs "with only minor stylistic and wording tweaks" and expressed concern about this apparent plagiarism. *See id.* In response, Lupi's counsel has filed a letter acknowledging his error. *See* ECF No. 54. On the facts of this case, the Court does not believe that sanctions would serve any useful purpose, and so declines to impose any.

## CONCLUSION

For the reasons explained herein, the AC is dismissed without prejudice and with leave to amend. If Plaintiffs intend to file a second AC ("SAC"), they must do so on or before July 21, 2025. If Plaintiffs file a SAC, any Defendant who then seeks to dismiss it shall file a pre-motion letter in accordance with Section IV.A of the Court's Individual Practices, or answer, on or before August 4, 2025. If Plaintiffs do not file a SAC on or before July 21, 2025, the Court will direct the Clerk of Court to enter judgment dismissing the RICO counts (Counts I and II) with prejudice and dismissing the remainder of the AC without prejudice.

In light of this dismissal, the Court stays all discovery in this action until Defendants file answers to the SAC and/or pending the resolution of any forthcoming motion(s) to dismiss.

SO ORDERED.

 */s/ Hector Gonzalez*  
 HECTOR GONZALEZ  
 United States District Judge

Dated: Brooklyn, New York  
       June 19, 2025