## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**ROOSEVELT ROAD RE, LTD.,**
**individually, and as subrogee of**
**ACCREDITED CASUALTY AND SURETY COMPANY,**
**and TRADESMAN PROGRAM MANAGERS, LLC,**       **Case No. 1:24-cv-05033**

                                        **Plaintiffs,**

**v.**

**SUBIN ASSOCIATES, LLP,**                       **SECOND**
**SUBIN & ASSOCIATES, LLC,**                      **AMENDED**
**HERBERT S. SUBIN,**                             **COMPLAINT**
**ERIC D. SUBIN,**
**JORGE ARTURO GONZALEZ LUPI,**
**PAULINA HURTADO,**
**GARY S. PARK,**
**MCDONALD WORLEY,**
**and JOHN DOES "1-50",**

                                        **Defendants.**

# TABLE OF CONTENTS

I.  JURISDICTION AND VENUE .................................................................................. 1

II.  THE PARTIES ......................................................................................................... 1

III.  FACTUAL BACKGROUND .................................................................................... 4

   A.  Fraud Scheme ....................................................................................................... 4

   B.  Plaintiffs' Exposure to the Fraud Scheme. ..........................................................11

     i.  Roosevelt's Assumption of Obligations and Liabilities as a Primary Carrier ......... 12

     ii.  Tradesman's Assumption of Obligations and Liabilities as a Primary Carrier ......... 13

   C.  The Enterprise ..................................................................................................... 18

   D.  Defendants' Pattern of Racketeering Activity, Damaging Plaintiffs,................ 56

   In Conducting or Participating in the Conduct of the Enterprise's Affairs ............... 56

     i.  Claimant A.............................................................................................................. 59

     ii.  Claimant B.............................................................................................................. 66

     iii.  Claimant C.............................................................................................................. 68

     iv.  Claimant D.............................................................................................................. 75

     vi.  Claimant F.............................................................................................................. 90

     vii.  Claimant Summary and Defendant's Participation in Pattern of Racketeering

       Activity ................................................................................................................. 95

IV.  PLAINTIFFS' JUSTIFIABLE RELIANCE ........................................................... 96

V.  DAMAGES............................................................................................................. 98

VI.  CAUSES OF ACTION .......................................................................................... 101

   COUNT I ................................................................................................................ 101
   RICO Violation (§ 1962[c])
   (As Against Subin Firm, H. Subin, Lupi, and Park)
   ("Count I Defendants")

   COUNT II ............................................................................................................... 105
   RICO Violation (§ 1962[d])
   (As against all Defendants)

   COUNT III .............................................................................................................. 107
   RICO Violation (§ 1962[a])
   (As against H. Subin)

   COUNT IV............................................................................................................... 108
   RICO Violation (§ 1962[a])
   (As against E. Subin)

COUNT V ...............................................................................................................110
RICO Violation (§ 1962[a])
(As against Lupi)

COUNT VI...............................................................................................................111
Common Law Fraud
(As Against H. Subin)

COUNT VII ............................................................................................................113
Common Law Fraud – Aiding and Abetting
(As Against Lupi)

COUNT VIII ...........................................................................................................114
Unjust Enrichment
(All Defendants)

COUNT IX...............................................................................................................115
Declaratory Relief Pursuant to 28 U.S.C. § 2201

VII.    JURY TRIAL DEMAND ..............................................................................116

## SECOND AMENDED COMPLAINT

Plaintiffs **ROOSEVELT ROAD RE, LTD.** (hereinafter referred to as "**Roosevelt**") individually, and in its capacity as subrogee of **ACCREDITED CASUALTY and SURETY COMPANY** (hereinafter referred to as "**Accredited**") and **TRADESMAN PROGRAM MANAGERS, LLC** (hereinafter referred to as "**Tradesman**") (collectively referred to hereinafter as "Plaintiffs"), by and through their attorneys THE WILLIS LAW GROUP, LLC, allege as follows:

## I.    <u>JURISDICTION AND VENUE</u>

1.      This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and at least one of the Defendants reside in this District.

## II.    <u>THE PARTIES</u>

3.      Plaintiff Roosevelt Road Re, Ltd. is a foreign limited company duly organized and existing under the laws of Bermuda. At all times relevant herein, Roosevelt was authorized to conduct business in New York.

4.      Plaintiff Tradesman Program Managers, LLC is a limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Tradesman maintained its principal place of business in the State of New York and is authorized to conduct business in New York.

5.      At all times relevant herein, Defendant SUBIN ASSOCIATES, LLP is/was a limited liability partnership organized and existing under the laws of the State of New York.

6.      At all times relevant herein, Defendant SUBIN & ASSOCIATES, LLC (together with SUBIN ASSOCIATES, LLP, "Subin Firm") is/was a limited liability company organized and existing under the laws of the State of New York. Upon information and belief, the entities comprising Subin Firm operate interchangeably, with similar or identical ownership structure, and operate in fact as a single entity.

7.      Upon information and belief, Defendant HERBERT D. SUBIN ("H. Subin") is a citizen of the State of New York and the principal, lead trial attorney at and part owner of Subin Firm, with an office at 150 Broadway, New York, NY 10038.  At all times relevant herein, H. Subin was licensed or otherwise authorized to practice law in the State of New York and, upon information and belief, oversaw, managed, and controlled all litigation with the firm, including regarding the Claimants mentioned herein.

8.      Upon information and belief, Defendant ERIC D. SUBIN ("E. Subin" and together with Subin Firm and H. Subin the "Subin Defendants") is a citizen of the State of North Carolina and a senior trial attorney at and part owner of Subin Firm.  At all times relevant herein, E. Subin was licensed or otherwise authorized to practice law in the State of New York and, upon information and belief, substantially assisted in overseeing, managing, and controlling litigation with the firm, including regarding the Claimants mentioned herein.

9.     Upon information and belief, defendant JORGE LUPI a/k/a Alejandro Gonzolez-Lupi, a/k/a Alejandro Gonzalez, a/k/a Jorge Gonzolez-Lupi, a/k/a Jorge Gonzalez ("Lupi") is a citizen of the State of New York.  At all relevant times herein, Lupi acted as an agent and runner, making decisions within his discretion in recruiting and transporting Claimants, arranging unnecessary medical services for Claimants, guaranteeing payment so as to induce medical providers to perform such necessary services for Claimants, and otherwise conducting and managing Claimants, including the Claimants herein.

10.     Upon information and belief, defendant PAULINA HURTADO ("Hurtado") is a citizen of the State of New York.  At all relevant times herein, Hurtado acted as an agent and runner, making decisions within her discretion in recruiting and transporting Claimants, arranged unnecessary medical services for Claimants, and further provided substantial assistance to Lupi's illicit endeavors; more recently Hurtado has begun providing substantial assistance to Worley.

11.     Upon information and belief, defendant GARY S. PARK ("Park") is a citizen of the State of New York and the principal of the LAW OFFICES OF GARY S. PARK, P.C. Park agreed to provide, and did so provide, substantial assistance in in the conduct by the other Defendants.

12.     Upon information and belief, defendant McDonald Worley ("Worley") is a citizen of the State of Texas and the principal of MCDONALD WORLEY, LLC. At all times relevant, Worley was licensed or otherwise authorized to practice law in the State of New York and agreed to provide, and did so provide, substantial assistance in the conduct alleged against the other Defendants.

13.     Upon information and belief, in addition to the named Defendants, John Does 1-50 are individuals, including attorneys, law firms, medical providers or other persons and entities whose level of participation and/or identities are currently unknown but who, through their actions

and omissions, conspired with the named Defendants to violate 18 U.S.C. § 1962 by participating in the affairs of the RICO enterprise through a pattern of racketeering activity as well as violating various related laws.

## III.  FACTUAL BACKGROUND

### A.  Fraud Scheme

14.    From at least 2018 to the present, with a marked escalation since 2020, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others by (i) unlawfully grooming and recruiting construction workers into staging and perpetuating fake construction accidents that occurred in New York and/or transforming legitimate minor or localized injuries into lucrative full-body claims; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting, and asserting fraudulent workers' compensation claims and personal injury lawsuits on behalf of such construction workers; (iii) facilitating the provision or alleged provision of medically unnecessary and excessive healthcare services to such construction workers; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate settlement value (the "Fraud Scheme").

15.    To be certain, the goal of the Fraud Scheme is to secure payments from workers' compensation and general liability claims.  The target of such payment is anyone, known or unknown, who will fund such payment.  As demonstrated more particularly herein, to reach their intended targets, Defendants caused direct damage to their intended targets and others in pursuit of the Fraud Scheme.

---

16.     Generally, under the New York Workers' Compensation Law, a worker injured on a construction site is entitled to prompt indemnity and medical compensation through a workers' compensation claim. Where the matter in which the worker is injured constitutes a violation of the New York Labor Law, the worker may also be entitled to compensation from the property owner or general contractor through a commercial general liability claim.  Both claims are almost always financially backed by one or more private insurance policies, e.g. primary, excess and reinsurance, because the State of New York and the City of New York requires that such claims be secured. *See* New York Workers' Compensation Law §50 (Security for payment of compensation through either state fund, private insurance and self-insurance); *see also* Rules of New York City, Title 1, Section 101-08 (Required Insurance and Indemnification).

17.     A worker's compensation claim is initiated by filing documents with the New York State Workers' Compensation Board ("NY WCB").  This is typically done by an attorney to establish injuries to specific body parts and to authorize medical treatment and indemnity payments for Claimants. This is determined through additional forms and documentation submitted to the NY WCB by and through the Claimant's attorney and directly by treating doctors and facilities. These forms identify the alleged workplace accident and injuries as well as the medical services provided in connection therewith.

18.     Further, these forms and documentation, when they facially appear to comply with the medical treatment guidelines or are presented as injuries needing treatment outside of such guidelines, are accepted and approved even when the information contained therein is false. Essentially, these Defendants deceive the NY WCB into establishing faked or pre-existing injuries and authorizing medical treatment all stemming from the alleged accidents.

19.     When a workers' compensation claim is initiated, the insurance carrier(s) involved must open a workers' compensation claim and assign both an adjuster and attorney to administer and defend the claim.  This in turn necessarily results in an immediate and direct costs.  Although New York State Workers' Compensation law requires the employer to be named as the "defendant," the intended target for monetary compensation for such claims is not just the employer's insurance carrier, but also anyone else who is required to fund medical and indemnity payments and compensation awards.

20.     A general liability claim is typically initiated through the filing of a lawsuit in one of the Supreme Courts of the State of New York.  It requires the filing of a verified Summons and Complaint, with the verification often executed by the Claimant's attorney rather than the Claimants.

21.     Subsequent to the filing and service of the Summons and the Complaint, additional documentation known as original and supplemental Bills of Particulars are prepared, verified by the Claimant's attorney and served upon all parties to the lawsuit. Claimants by and through their attorneys in personal injury lawsuits would have necessarily submitted documents attesting to the alleged workplace accident and associated injuries.

22.     Similar to workers' compensation claims, in a general liability claim the insurance carrier involved necessarily opens a general liability claim and assigns both an adjuster and attorney to administer and defend the claim.  This is usually a different adjuster and attorney from the workers' compensation claim.

23.     Nonetheless, it also in turn necessarily results in immediate and direct costs.

24.     New York Labor Law assigns liability to property owners and general contractors. As a result, the property owners and general contractors are commonly named defendants in a

general liability claim lawsuit. Due to associated subcontract agreements, these lawsuits often result in one or more third-party claims against subcontractors. The Claimants and their attorneys do not always know who or what subcontractors may be brought in or what insurance carriers will ultimately be exposed at the time they implement these claims in furtherance of the scheme. But that is not an issue about which Claimants and their attorneys care because they leave it to the named defendants and third-party defendants to sort it out themselves. Thus, the intended targets for monetary compensation in a general liability lawsuit are the exposed insurance carriers and/or anyone else, excess carriers, reinsurers, etc., known or unknown, who can or will be required to fund settlements.

25.    Here, Defendants are sophisticated actors with years (if not decades) of knowledge of personal injuries claims and the workings of liability insurance policies. H. Subin and E. Subin have been licensed attorneys since 1989 and 2012, respectively. Both have coordinated and pursued fraudulent claims with Lupi and the other Defendants since at least 2018. As such, H. Subin and E. Subin are well aware that the pursuit of personal injury claims result in costs well beyond just settlement and award payments, e.g. costs for the administration of claims, defending lawsuits, etc., and that entities other than a named insurance carrier will incur such costs beginning with the initiation of a claim and continuing through its resolution.

26.    At all times relevant, the Defendants perpetuated and conducted the Fraud Scheme through the Fraud Scheme Enterprise, with Subin Firm, or its various corporate alter-ego entities, coordinating and managing the overarching scheme and directing the individual components.

27.    The "Runners," including Lupi and those acting under the direction of Lupi, including Sixto Delgado, as well as other known Subin runners including Arnulfo Serrano (19 associated cases including the infamous Lesly Ortiz matter) and Tanvir Chaudhry, altogether

operating in furtherance of the Fraud Scheme and under the control and direction of E. Subin and H. Subin and in coordination with others in the Enterprise, recruited construction workers Claimants into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

28.    Regardless of any actual bodily injury stemming from the purported construction accidents, these Claimants were instructed by the Runners, under the direction of and in coordination with Defendants and by and through the Fraud Scheme Enterprise members, to fake and to claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment.

29.    The Runners then referred and/or transported these Claimants to the Subin Firm, where attorneys and/or other employees of the Subin Firm, at the direction of and in coordination with Defendants, met with these Claimants.

30.    Defendant Lupi was one such "runner" who, along with persons acting under his direct and ongoing control, including but not limited to Sixto Delgado, recruited Claimants and directed Claimants to the Subin Firm and to the Medical Providers, all on behalf of the Fraud Scheme Enterprise, and at the direction of, and in coordination with, the Subin Defendants.

31.    The Subin Firm and its corporate alter-egos, at the direction of and in coordination with Defendants, represented the Claimants and initiated the general liability lawsuits and resulting insurance claims (which resulted in financial exposure to Roosevelt and Tradesman) filed against the various parties involved with the construction project (e.g., owner, general contractor, construction manager, etc.) for purported injuries that resulted from accidents on the construction project.

32.     For workers' compensation claims, the Subin Firm, at the direction of and in coordination with Defendants, referred the Claimants to certain other complicit law firms ("WC Firms"), with which Defendants had an agreement and understanding as to the Fraud Scheme and from which the Subin Firm would receive financial remuneration that was based on the amount of the settlements obtained by the WC Firms, and the WC Firms represented the Claimants in connection with claims made to the NY WCB.

33.     For most Claimants, both general liability lawsuits and workers' compensation claims were initiated and proceeded in parallel to maximize profit for the Subin Firm, and ultimately for the Fraud Scheme Enterprise.

34.     In order to inflate settlement value and workers' compensation benefits, and thereby effectuate higher profit, the Runners and/or attorneys and/or other employees of the Subin Firm, at the direction of and in coordination with Defendants, directed the Claimants to seek medical treatment from associated medical providers ("Medical Providers") who provide a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at facilities located in, or to patients from, multiple states, including New York and New Jersey.

35.     These Medical Providers also had an agreement and understanding as to their involvement in the Fraud Scheme, including providing fraudulent, unwarranted, and/or treatment wholly unrelated to any purported accident, and provided such falsified medical documentation to the Subin Firm for use as needed for higher settlement values, in furtherance of the Fraud Scheme Enterprise and in exchange for Defendants continuing to funnel patients to their offices and additional monies obtained via predatory litigation funding.

36.     Many of the Claimants are undocumented immigrants who do not speak English and were assisted by Defendants in obtaining false work authorization credentials, and the

Claimants, as part of the Fraud Scheme, were instructed to fake or misrepresent their accidents and injuries and to receive a myriad of healthcare services that were unnecessary, excessive, unwarranted, and costly.

37.    As an incentive to attest to fraudulent accidents and injuries and to undergo unnecessary surgery, Claimants were offered cash advances as well as a percentage of any settlement proximate to retaining Defendants following alleged accidents and injuries, and, additionally, via litigation funding sources after they filed suit and after they completed surgery.

38.    By representing Claimants and pursuing settlement on behalf of Claimants, Defendants, by and through and on behalf of the Fraud Scheme Enterprise and *via* the underlying state proceedings brought and prosecuted through the Subin Firm, earn a certain percentage of the judgment or settlement as compensation, in addition to other moneys obtained via unnecessary litigation funding which is filtered through other limited liability companies to ultimately return to the Subin Firm and others, to the specific and foreseeable detriment of the Claimants themselves.

39.    By referring Claimants to WC Firms to pursue workers' compensation benefits on behalf of Claimants, the Defendants, by and through the Subin Firm, maintained control over treatment allegedly provided while WC Firms earned a certain percentage of the workers' compensation benefit as compensation.

40.    Workers' compensation benefits and settlement values increase based on the extent and severity of the claimed medical treatment. By directing Claimants to receive unnecessary, excessive, unwarranted and costly healthcare services, Defendants intentionally, fraudulently, and unlawfully inflated workers' compensation benefits and settlement values from which the Subin Firm and Defendants received financial gain, and which furthered and perpetuated the Fraud Scheme Enterprise.

41.    At all times relevant, and by the very nature and function of the Fraud Scheme, the Defendants were aware of and in agreement with each other to conduct the Fraud Scheme and their respective roles in pursuing fraudulent claims.

42.    Upon information and belief, the agreement and understanding between the Defendants was that the Fraud Scheme would continue on an ongoing basis and in perpetuity and, as a result, has become standard operating procedure in the Fraud Scheme Enterprise.

43.    The intended victims of the Fraud Scheme were the insurance carriers and other payors required to provide Workers' Comp benefits and to pay out general liability settlements and awards in lawsuits brought in New York State courts.

**B.    Plaintiffs' Exposure to the Fraud Scheme.**

44.    A policy of insurance sets forth obligations and liabilities of an insurance carrier when a claim is made against the policy.

45.    In the State of New York, a carrier can relinquish these obligations and liabilities by substituting itself with others.  Such is the case here where Accredited, by agreements, substituted itself with Roosevelt, a reinsurance carrier, and Tradesman, a managing general agent, thereby placing Plaintiffs in a primary role and Accredited in a secondary role.

46.    In all policies of insurance implicated by the claims at issue herein, Plaintiffs, not Accredited, directly fulfilled and continue to fulfill the obligations of a primary carrier, i.e., with Tradesman issuing policies and administering claims, and Roosevelt effectuating the duty to defend insureds and bearing risk and indemnity.

47.    In all policies of insurance implicated by the claims at issue herein, Plaintiffs, not Accredited, directly sustained and continue to sustain the liabilities of a primary carrier, e.g., the costs of administering, defending and resolving claims.

### *i.*    Roosevelt's Assumption of Obligations and Liabilities as a Primary Carrier

48.    As set forth hereinbefore, the relationship between Roosevelt and Accredited is not a standard insurer-reinsurer relationship.[1] At all times relevant, Accredited was merely a fronting company. Specifically, Accredited only allowed its name to be used on paper, i.e., the policies were issued in Accredited's name in exchange for a percentage of the premiums earned on such paper. Accredited did not assume the obligations and liabilities of a primary carrier such as issuing policies, administering claims, posting reserves, defending claims or payment expenses leading up and resolving claims. Rather, Roosevelt and Tradesman assumed them instead.

49.    Roosevelt, in particular, incurred the obligations and liabilities to post reserves and directly pay from those reserves the expenses related to a primary insurer's duty to defend[2] and resolve claims brought against policies issued in Accredited's name. This duty to defend includes, but is not limited to, incurring the following costs: medical payments, indemnity payments, filing fees, attorney's fees, expert fees, independent medical exam fees, costs of records, settlements and judgments.

50.    In the claims at issue herein, Roosevelt had and did engage its duty to defend which resulted in Roosevelt's direct payment of expenses related to the claims. This includes both workers' compensation and general liability claims, proceedings and lawsuits. For reasons stated below, these claims are fraudulent and were brought in furtherance of the Fraud Scheme. Because

---

[1] In a standard reinsurance relationship, the primary carrier retains all obligations related to the policy, including the direct payment of expenses. The primary carrier then seeks reimbursement of expenses from the reinsurer. The reinsurer, therefore, has no obligations, discretion or authority of the underlying claims against the primary carrier.

[2] Under New York State law, an insurer's duty to defend (a) is triggered upon the filing of a claim and/or lawsuit and, (b) mandates that such costs be incurred in discharging the duty. Failure to incur such costs, comprising a portion of the damages asserted herein, would result both in default judgment and Plaintiff's violation of law.

these claims never should have been brought at all, Plaintiffs would not have incurred these expenses but for the Defendant's pursuit of the claims in furtherance of the Fraud Scheme.

51.    Based upon their history of pursuing personal injury claims, their education and experience and in accordance with the goals of the Fraud Scheme, Subin Defendants herein knew or should have known that these costs were certain to occur and that one or more insurance carrier or party, here Roosevelt, would have to pay them.  Moreover, pursuant to New York disclosure rules and laws, Defendants had an opportunity to identify Roosevelt's exposure in all subject claims, even if they failed or intentionally refused to do so.

52.    At all times relevant herein, Accredited could only re-assume its obligations as the primary financial carrier in the event of Roosevelt's insolvency.  To date, that has not happened.

53.    Further, Accredited reserved the right but was never obligated let alone legally mandated (which through operation of the contracts and law, was borne by Roosevelt) to take the lead on accepting, investigating, and adjusting claims on a claim-by-claim basis. In fact, at all times relevant, Accredited never exercised this right.

### *ii.*    Tradesman's Assumption of Obligations and Liabilities as a Primary Carrier

54.    At all times relevant by agreement, Tradesman, like Roosevelt, was substituted for Accredited and assumed, as managing general agent, some obligations and liabilities related to policies issued in Accredited's name and claims made against same.

55.    Specifically, Tradesman was responsible for brokering and issuing policies.  As a part of those duties, Tradesman was responsible for calculating and collecting premiums on such policies and maintaining records and accounting related to the policies.  All issued policies contained the following notice that demonstrated Tradesman's involvement and relationship with Accredited:



56.    By agreement, Tradesman was also responsible for the payment of all direct expenses it incurred related to the policies it issued:

> **Pay its Expenses.**  Except for such fees and expenses for which Company is responsible, GA warrants that it is and shall remain responsible for all direct fees and expenses incurred by GA attributable to Policies produced under this Agreement.

57.    In the above provision, "Company" is Accredited and "GA" is Tradesman.  The costs of administering claims, which is incurred upon claim opening, is a direct fee and expense attributable to policies produced under Tradesman's agreement with Accredited.

58.    When a claim is presented against a policy, e.g., a workers' compensation or general liability claim, Tradesman must open the claim, which results in the assignment of an adjuster and appointment of defense counsel.    Compensation for a claim, such as a settlement, cannot be obtained without opening the claim first.  Tradesman's cost to open the type of claims at issue herein are ranging from $1,000.00 up to $5,000.00. These costs are incurred directly by Tradesman, and Tradesman pays it immediately. Therefore, a claim that should not have been presented, e.g., a fraudulent claim, requires Tradesman to incur a cost it should never had to pay.  Moreover, these costs damage Tradesman's business by reducing its profitability on the relevant policy(ies) at issue.

59.    Again, for the reasons stated below, the claims made the subject of this lawsuit are fraudulent.  Yet, the Defendants caused these claims to be opened anyway thereby wrongfully causing Tradesman to incur the costs of administering claims that were not legitimate.

60.    Again, based upon their history of pursuing personal injury claims and their education and experience, Defendants are intimately familiar with insurance claims process and therefore knew or should have known the presentation of a claim to an insurance carrier would result in administration costs, such as the assignment of an adjuster.  In fact, upon information and belief, the Defendants directly communicated with adjusters, including those assigned to the claims made the subject of this lawsuit.

61.    Tradesman bears the risk that the number of claims presented against a policy results in administration costs that exceed the commission Tradesman earns on the policy.  When this occurs, for example, by the filing of fraudulent claims that are illegitimate, the result is a net loss – or lost profit – on the policy.  Accordingly, in the course and practice of Tradesman's business, it necessarily follows that the filing of fraudulent claims (as alleged here) directly reduces the profitability of the policy (or policies) affected by the fraudulent claims.  Accordingly, Tradesman, like Roosevelt, has been directly harmed or injured by Defendants' alleged racketeering activity.

62.    At all times relevant herein, the Plaintiffs' exposure to harm or injury began each time the Defendants orchestrated and presented a fraudulent claim and continue(d) until/when the claim is resolved.  *See* Figures 1 and 2.

**Figure 1. - Workers' Compensation Claims**

| **Tradesman Paid** | | **Tradesman Paid** |
|---|---|---|
| **Claim Opening** – Claim is made to Tradesman, usually by receipt of a C-3 form. Expense: Claims administration paid by Tradesman | → | **Adjuster Assigned** – Tradesman assigns an adjuster from Gallagher Basset Expense: Claims administration paid by Tradesman |

**Roosevelt Paid**

**Defense Counsel Assigned** – Tradesman assigns an attorney to defend the claim at the Workers' Compensation Board.

Expense: Duty to Defend costs including attorney's fees and fees for investigation, records, experts, depositions, and independent medical exams paid by Roosevelt

→

**Roosevelt Paid**

**Claim Resolution** – Claim is resolved usually through settlement or payment of a Workers' Compensation award.

Expense: Settlement (usually lump sum), payment of medical services (paid through pendency of claim), indemnity payment (paid through pendency of claim) paid by Roosevelt

**Figure 2. - General Liability Claims**



**Tradesman Paid**

**Claim Opening**
– Claim is made to Tradesman, usually by receipt of a Summons and Complaint.

Expense:  Claims administration paid by Tradesman

**Tradesman Paid**

**Adjuster Assigned** – Tradesman assigns an adjuster from Gallagher Basset

Expense:  Claims administration paid by Tradesman

**Roosevelt Paid**

**Defense Counsel Assigned** – Tradesman assigns an attorney to defend the lawsuit.

Expense: Duty to Defend costs including attorney's fees and fees for investigation, records, experts, depositions, and independent medical exams paid by Roosevelt

**Roosevelt Paid**

**Claim Resolution** –

Claim is resolved usually through settlement of the lawsuit or payment of a judgment after trial.

Expense: Payment of settlement or judgment against insured paid by Roosevelt

63.    In the alternative, without waiving the foregoing, Roosevelt brings this action as subrogee of Accredited and under the equitable rights of subrogation, which allow Roosevelt to step into the shoes of Accredited.  In that capacity Roosevelt may maintain this action on behalf of Accredited and recover all damages articulated herein.

C.    **The Enterprise**

64.    Together, Defendants constituted an association-in-fact "enterprise" (the "Fraud Scheme Enterprise") as that term is defined in 18 U.S.C. § 1961(4), which together conducted the Fraud Scheme, and in doing so engaged in, and the activities of which affect and affected, interstate commerce. The members of the Fraud Scheme Enterprise are and have been joined in a common purpose – to conduct, operate, maintain, and profit from the Fraud Scheme *via* prosecuting fraudulent Workers Comp claims and general liability lawsuits that arose out of staged worksite injuries and were supported by fraudulent legal filings and medical documentation of either unnecessary, unjustified medical treatments and/or outright medical record fabrications. , all of which was the for the purpose of defrauding the Fraud Scheme's intended victims, including Plaintiffs and others similarly situated.

65.    Although different members have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose - to defraud Plaintiffs and others through fraudulent Workers' Comp claims and general liability lawsuits - and with sufficient longevity to accomplish that common purpose.

66.    The enterprise has been engaged in this pattern of racketeering since at least 2018, which is a sufficient amount of time for the enterprise to pursue its purpose of obtaining money by

filing and prosecuting fraudulent workers' compensation claims and general liability insurance lawsuits that arose out of staged worksite injuries.

67.     Specifically, Lupi, a convicted felon, has spent the last decade and beyond engaged in, as a necessary step and in furtherance of the Fraud Scheme, generating and securing the continued cooperation of the willing Claimants to file and prosecute the Workers' Comp claims and general liability insurance lawsuits.

68.     Lupi recruited construction workers into staging and/or perpetuating staged construction accidents; secured their retainer of the Subin Firm and/or other Fraud Scheme Enterprise associated Firms, known (including Park) and unknown, often contemporaneous with saddling such Claimants with litigation funding "advances" with otherwise-usurious levels of interest in exchange for "broker" fees; coordinated, monitored, and managed unnecessary medical treatment for Claimants in coordination with the Fraud Scheme Enterprise, and guaranteed payment for such services; provided, received, and facilitated illegal kickbacks and bribes; engaged in money laundering and unauthorized money transmitting; and, reinvested proceeds from the Fraud Scheme in furtherance of expansion of Fraud Scheme and into operation of the Fraud Scheme Enterprise.

69.     Lupi was not an unknown operator to the Fraud Scheme Enterprise or its members acting in secret or in unannounced parallel. Lupi quite literally had a "seat at the table" with Subin – they met with Claimants together, including a Claimant who gave the following testimony ("Prior Claimant 1"):

```
insurance, it says "insurer: Subin &
Associates, Jorge Lupi." Who is Jorge Lupi?
     A.    He was in the meeting with
Subin.
     Q.    Were you at that meeting?
     A.    Yes, sir.
     Q.    Why was Jorge Lupi there?
     A.    I don't know.
     Q.    What did you tell them?
     A.    That I had an accident.
     Q.    Who called this meeting?
     A.    My friend Sixto had spoke with,
I don't know who, and they gave me an

appointment.
     Q.    Was this the first time that
you met with Subin?
     A.    Yes, sir.
```

70.     Lupi, who Prior Claimant 1 met for the first time at her appointment with Subin
Firm, continued to have contact with Prior Claimant 1.

```
     Q.    Other than this meeting, did
you ever talk to Jorge Lupi again?
     A.    On occasion, yes, sir.
```

71.     Lupi directly stated to Prior Claimant 1 that he would be guaranteeing the payments
for medical treatment – if her case was accepted, in this context, by Subin.

> ```
>     Q.    Did Jorge Lupi tell you that he
> was guaranteeing the medical payments for
> your treatment?
>     A.    If the case was accepted, yes.
> ```

72.    Lupi has similarly engaged in such conduct in furtherance of the Fraud Scheme not just individually, but through the use of various entities and shells, including J&D Investigation Services Corp. ("JD Service"), Amedico Legal, LLC ("Amedico"), AmedicoLegal Funding, LLC, Amedico Legal Network, LLC, and Amedico Holdco, LLC, and through entities nominally owned by others through which Lupi exerted ownership and control, including M.K.S. Consultants Inc. d/b/a Latinos Legal Connections ("MKS"), which is nominally owned by Lupi's girlfriend (incorporated 16 days after Lupi filed for divorce), herself a trip and fall Claimant under Queens County Supreme Court, Index #: 704784/2018, brought by Park and transferred to Subin Firm.

73.    Upon information and belief, JD Service was initially formed with Lupi's now ex-wife, and was one of the top two "brokers" responsible for "developing" a book of litigation funding advances worth over $22 million through Express Funding of America, LLC, of which JD Service's broker fees were in excess of $2 million and many of those Claimants were steered to Subin Firm. This book of advances ultimately became the subject of litigation between Express Funding and Cherokee Funding (purchaser of the receivables), in part due to the following:

> 84.    Subin Associates, LLP, a New York-based law firm that was representing many of the claimants in connection with Sold Receivables, has filed motions to involuntarily withdraw from many of the cases underlying the Sold Receivables, upon information and belief, over concerns that that certain claims that were brought to it by a runner for the firm, Jorge Lupi, may be fraudulent.
>
> 85.    Upon information and belief, EFA paid nearly two million dollars in broker fees to Mr. Lupi in connection with the Sold Receivables.

74.    In addition to the "origination"-level litigation funding advances, frequently through Subin's preferred company owned by long-time business associate Neal Magnus under various "Best Case" monikers, and after having steered Claimants to litigation funding-paid surgeons and increasing the "tab," Lupi, by and through Amedico and other entities, would induce Claimants, who often did not speak any English, to repeatedly "refinance" these advances *via* agreements that were entirely in English, reaping ever-larger broker fees. How this plays out is foreseeable and intentional:

```
            How many loans do you have in
connection with this litigation?
      A.    More than two.  How many
exactly, I don't remember.
      Q.    And these were loans that you
were given to use yourself, correct?
      A.    Yes, sir.

   Q.    How much money were you lent?
   A.    I don't remember.
   Q.    More than $50,000?
   A.    I don't remember.
   Q.    More than $100,000?
   A.    I don't remember.
```

A.    I don't remember.

Q.    You're not saying no; you don't remember, right?

A.    Exactly, I don't remember.

Q.    More than $250,000?

A.    I don't remember.

Q.    More than $300,000?

A.    I don't remember.  Can I say something?

Q.    There isn't a question pending.

MR. DELLIS: No, do not say anything.  Let him continue asking you the questions.

Q.    More than $500,000?

A.    I don't remember.

Q.    Do you know if the total amount of your outstanding loans is more or less than $1 million?

A.    I don't remember.

Q.    So if you had to make a payment for one of these loans, what would you do?

A.    I would suppose that the lawyer has everything, that the lawyer manages everything and I would trust him to handle everything.

Q.    Do you recall signing any agreements with Cartiga or Plaintiff Funding?

A.    I don't remember.

75.     Notably, the company referenced as holding a portion of Prior Claimant 1's funding advances, Cartiga, was recently sued by a former employee.

76.     Between April 2023 and October 2023, Kristopher Hassett was employed by Cartiga, which is the resulting company of a three-way merger between Legal Business Services (f/k/a Westbury Management Group), Ardec Funding, and LawCash. There is a long history of interplay and overlap between these entities, their principals, and other major entities in the legal funding world. Mr. Hassett sued Cartiga for wrongful termination, and his allegations are particularly relevant herein:

> 4.     Respondent is in the business of providing funding to law firms and clients in connection with and in support of legal actions filed by law firms on behalf of their client.
>
> 5.     Specifically, Respondent would fund medical procedures for claimants to undergo and provide loans to claimants based upon the value of their claim.
>
> 6.     In some instances, Respondent's representations would encourage claimants to undergo medical procedures in return for increased personal funding in order to maximize the potential value of their claim.
>
> 9.     In or about April 2023 through August 2023, I performed a risk assessment of Respondent's investments in funding of New York Labor Law § 240 claims.
>
> 10.     During my assessment, I discovered what I, in good faith, belief to be a violation of New York law, statute, ordinance, and/or code: the funding and further supporting of fraudulent claims.
>
> 22.     Upon recall and recollection and upon contemporary notes I took, during a meeting on August 29, 2023 with Mr. Boganski and Mr. Brady, I reported that a partner firm appeared to be all fraudulent with no identification or documents. Furthermore approximately $5,500,000.00 were funded against standard underwriting policy. I also stated that I saw similar issues at two other partner firms; but again was told it was none of my business.

77.     On a recorded telephone call *that day* regarding concerns of the partner firm appearing to be *all fraudulent*, the topic at hand is the Fraud Scheme itself, the unsophisticated targets, and that they are ill-equipped to deal with the "Jorge Lup[i]'s of the world."

```
going to disappear, okay.  But against the
backdrop of, for instance, the Jorge Lupes of the
world, we're not built on Jorge Lupe having all
these clients.  It was unsophisticated people
who, they themselves had a case or they had a

friend who had a case, but they don't know a
lawyer.  They don't know -- bring anybody -- oh,
bring it to Jorge Lupe, he gets cases funded.  He
gets lawyers.  He'll get you a case.  As if like,
the lawyer is deigning, doing a favor to take it.
          Okay, and so then, now, as it started
to continue, people realize, I don't need Jorge
Lupe, okay, and then there became spinoffs, and
then the spinoffs tried to do the same deal as
Jorge Lupe, and they did.  But now, the spinoffs

from the spinoffs realize, I didn't need -- I
don't need this.  I can just do my own, but we
tell them that things are different.  Funding
companies are looking into things more closely.
This is -- maybe that gravy train is ending,
blah, blah, blah.  They're looking at things more
closely, and so here is the new scenario.  Okay,
```

RICHARD:  Okay, I mean, I don't know if
you guys want to talk about this, but I feel like
we're all in it together.  We all kind of know
the deal, and I feel it's useful for me to share
--

up the underwriting team.  So we're just trying
to find the right balance of a skittish
underwriting team, and you're getting cast with
the same brushes that we -- we work with Sube,
and we work with Schweizer.  We work with
Windgate.  We work with all these firms, and you

involved.  Chris has been involved, and we'd like
to just, you know, we had a nice run with you,
getting things in.  And we're just getting a
little bit more questions asked, so we want to
make sure we have --

RICHARD:  That's fine.

JIM:  We'd rather not, but we
understand that we may have to do a few favors
for you.  That's what I'm saying.  But it's -- we
don't --

> JIM: Okay, that's good to hear. I
> didn't -- I don't know all the intricacies. It's
> just that -- we just want to come back with like
> a scenario, and then as things progress, as you
> know, MRIs are positive, you know, the workers'
> comp is not controverted, you know, the next step
> is going to be the scope. It's going to be a
> possible fusion, and now I still don't think we
> want to get to these big chunks of funding,
> because it -- you know, then you've got to deal
> with it down the road.
>
> I just like to give the client as
> little money as possible that he's happy and he's
>
> not going to leave you. Like that, you know, we
> want the client to be happy but not --
> RICHARD: That's fine with me, yeah.

78.    Within this remarkable discussion, it is clearly stated that this attorney doesn't want to be cast in the same brush as "Sube," and that Jorge Lupi is killing the golden goose with *too many* fraudulent claims.

79.    The case of the Claimant below ("Prior Claimant 2") played out similarly:

---

**SECOND AMENDED COMPLAINT**                                    **PAGE 27 OF 116**



**DISCLOSURE STATEMENT, PURCHASE AND CONSIDERATION**

Upon receipt of this executed Agreement and the other documents which are described herein (including but not limited to the Letter of Instruction and the Attorney Certification and Undertaking described in Exhibits A and B hereto, respectively), Liberty agrees to advance to Seller/Claimant the sum of **$142,931.02** (the "Cash Advance amount") **of which $10,000.00 now and then $3,000.00 monthly thereafter for 3 consecutive months starting on 02/01/2023 will be made payable to:**       **A payoff in the amount of $106,930.42 will be made payable to: Best Case Management Services, Inc. Also, a $17,000.60 origination fee shall be payable to: Amedico Legal, LLC.** The Seller/Claimant hereby sells to Liberty the Seller/Claimant's right to receive certain proceeds which may result from the resolution of the claim more fully described in the first WHEREAS clause below and in accordance with the terms described below.

80.    Eight (8) months later, Prior Claimant 2 signed another refinance contract with Pegasus – with a worse rate of interest, and a fresh $20,000 origination fee.

### PEGASUS

**ASSIGNMENT, SALE, SPRINGING ASSIGNMENT & EQUITABLE LIEN AGREEMENT**

THIS AGREEMENT (the "Agreement") is made and dated as of __10/6/2023__, by and between ▮▮▮▮▮▮▮, residing at ▮ the "Seller"), and **Pegasus Fund, LLC ("PF")** with a principal place of business located at 3505 Veterans Memorial Hwy, Suite D, Ronkonkoma, NY 11779 (the "Purchaser").

**DISCLOSURE STATEMENT**

A. Property to be purchased from the Seller under the agreement:         $20,000.00
    1. Buyout (Payable to: Liberty Pre-Settlement Funding, LLC):     $178,789.99
B. Applicable Fees to be added to and associated with the above amount:

                                          Origination Fee    $19,879.00
                                          Admin Fee    $500.00
                                      **TOTAL PURCHASE VALUE:**    **$219,168.99**

C. Monthly Use Fee:               N/A
D. Compounding Method:        Non-Compounding
E. First Year Annualized Use Fee:   **40.00%**

81.    The above was far from unbeknownst to, but in fact in direct coordination with, the Fraud Scheme Enterprise. Prior Claimant 2 was a Subin Firm client. Both Liberty and Pegasus contracts were signed by Arnie Baum, as COO of Subin Firm (and the *six* Best Case advances prior were each signed by Arnie Baum as well); regardless, payment from the advances were to be made as follows:

Liberty



Pegasus

**PAYMENT INSTRUCTIONS**

☒  **Option 1: eCheck** sent in my name via **Email** for same day delivery, if submitted before 5pm EST ($75.00 added to your payoff amount at time of payment/satisfaction of our lien).

Email: Paulina@amedicolegal.com

82.     That email address is for Defendant Paulina Hurtado, who agreed to and did in fact provide substantial assistance to Lupi in the conduct alleged herein (and at least nominally now works for Defendant Worley). In this instance, she caused that eCheck to be transmitted by email from Pegasus to her Amedico e-mail address, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.



---



83.    Lupi and his entities operated out of Park's office, and the eCheck was emailed to defendant Hurtado at her Amedico email address – *i.e.*, Lupi and Amedico received those checks. Assuming (perhaps optimistically) that these checks were transferred to Prior Claimant 2, Lupi and Amedico (under his ownership and control) operated as unauthorized money transmitters, in violation of 18 USC § 1960.

84.    Upon information and belief, an agreement existed between Lupi, Park, and Subin Firm that Lupi's generated Claimants would be "referred" by Park to Subin Firm, so as to conceal payments of the Fraud Scheme proceeds to Lupi through misrepresentation of innocuous-appearing referral fees to be recorded with the patina of legitimacy, in violation of 18 USC §§ 1956 & 1957, the number of such occurrences being exclusively within the knowledge of Defendants and unable to be ascertained by Plaintiffs without discovery.

85.    Ultimately, Prior Claimant 2's case would be cast off in what will become a familiar refrain, seen repeatedly *infra*.

> 11.    At this time, SUBIN ASSOCIATES, LLP, does not believe it appropriate for it to continue to litigate this matter pursuant to the New York Rules of Professional Conduct.
>
> 12.    This Affirmation is not detailing all of the relevant facts, but we are prepared to do so on an *in-camera*, *ex parte* basis if required to do so by the Court.[1]

86.    Park provided Lupi and his entities not just a physical office from which to freely operate but further provided him with a law firm email address and acquiesced to Lupi falsely holding himself out as an attorney at the Park firm. This was not a mere "paper" address; on November 17, 2021, an attempted service on a Park firm attorney resulted in service upon Lupi, identified as a "co-worker."

| Claim/ Case #: | ▮▮▮▮▮▮▮▮▮▮ | . | Accident Date: 12/05/2019 |
|---|---|---|---|
| Claim Address: | | | |
| Atty: | JORGE LUPI ( GARY PARK LAW) | P# | F# |
| PAT Date & Time: | | | |
| ATTORNEY EMAIL:Jlupi@garyparklaw.com | | | |

NORBERTO MALDONADO being duly sworn, deposes and says; I am over 18 years of age, not a party to this action, and reside in the State of New York. That on the **17TH** day of **NOVEMBER 2021**, **3:53PM** at

**39-01 MAIN STREET**
**SUITE 608**
**FLUSHING, NY 11354**
I served the **THIRD PARTY SUMMONS & THIRD PARTY COMPLAINT, EXHIBIT(S), NOTICE PURSUANT TO C.P.L.R.1007, NYSCEF CONFIRMATION NOTICE**, upon **YOSEF H. LEE, LAW OFFICES OF GARY S. PARK, PC, the ATTORNEY FOR PLAINTIFF**, therein named by delivering and leaving a true copy or copies of the aforementioned documents with **J LUPI (REFUSED FULL NAME), CO-WORKER,** a person of suitable age and discretion.

87.    Utilizing a Park law firm address, holding himself out as an attorney, and guaranteeing payment on medical provider documentation was not a one-off occurrence, but pattern and practice within the conduct of the Fraud Scheme Enterprise. In addition to the examples set forth within the instant Claimant sections *infra*, Lupi has held himself out as an attorney in the context of managing Claimant medical care in coordination with Park and Subin Firm unabated over a course of several years.

88.    Lupi, as well as other members of the Fraud Scheme Enterprise, in conducting the affairs of, and for benefit to, the Fraud Scheme Enterprise, offered, conferred, or agreed to confer "things of value" to both Medical Providers (financing through litigation funding, current and

future referrals, payment guarantees) as well as Claimants (litigation funding advances, payment guarantees on treatment, inflated promised settlement values), both essential witnesses in the underlying case, with the understanding that these witnesses will have their testimony influenced; *i.e.*, Lupi, in furtherance of and in conducting the affairs of the Fraud Scheme Enterprise, repeatedly engaged in violations of New York State Penal Law § 215.00, Bribery of a Witness, a Class D Felony; itself a predicate act under 18 USC § 1961(1)(A), as well as specified unlawful activity as defined under 18 USC § 1952.

89.    Indeed, the full constellation of the circumstances surrounding the referrals for these surgeries provide reasonable and plausible inference of a bribery and kickback scheme.

90.    Notably, Mountain Surgical Center is in New Jersey. New York-based Lupi, with the intent to promote, carry on, or otherwise facilitate such specified unlawful activity above, necessarily made use of the wires, mail, or otherwise used facilities in interstate commerce in arranging and coordinating treatment with Medical Providers at this location, as well as in coordinating travel for New York-based Claimants, and thereafter in fact so promoted, carried on, or otherwise facilitate such specified unlawful activity. Each arranged interstate surgery was therefore a violation of 18 § USC 1952.

91.    Subin Firm, also New York-based, coordinated travel for New York-based Claimants to receive unnecessary medical treatments with the intent to promote, carry on, or otherwise facilitate such specified unlawful activity as described above, necessarily made use of the wires, mail, or otherwise used facilities in interstate commerce, and thereafter in fact so promoted, carried on, or otherwise facilitate such specified unlawful activity. Each arranged instance of medical travel, particularly the interstate surgeries, were therefore violations of 18 § USC 1952.

> Q.    So if you didn't pay for any of
> it and you didn't have private health
> insurance, was it your understanding that
> Subin would be paying for all of the
> medical treatment you had?
>
> A.    Yes, sir.
>
> Q.    Who made, if you don't drive,
>
> who made arrangements for you to get to the
> various medical facilities?
>
> A.    Subin.

92.    Each of the below is directly from publicly filed and available records:

**Patient Name:** SUBIAGA JOSE

**Address:** [redacted]    **City:** WEST NEW YORK    **State:** NJ

**Home #:** _____    **Cell#:** [redacted]    **Work#:** _____

**DOB:** [redacted]    **SS#:** _____

**Parent Name (if minor)** _____    **Addl Phone#** _____

**Primary Insurance:** NYWC American Zurich    **Phone #:** _____

**ID#:** _____    **Group #:** _____

**Secondary Insurance:** _____    **Phone#:** _____

**ID#:** _____    **Group#:** _____

**Auto/Workers Comp:** _____    **Phone#:** _____

**Adjuster:** Elisa Mosley    **Phone#:** 20,

**Claim/ Case #:** [redacted]    **Accident Date:** _

**Claim Address:** _____

**Patient Advocate:** _____    **Phone#:** _____
Lawyer Jorgi Lopi



*Subin Firm took over case in September 2021. Two months later, November 2021, the Claimant was getting surgery as referred by "lawyer Jorge Lupi," with a Park firm email address.*



*Represented by Subin Firm. March 2023.*



*Represented by Subin Firm. May 2023.*

93.     As far back as September 2017, Park was affiliated with Lupi, as evidenced by correspondence to a client indicating Jorge Lupi from his office would be picking them up:



94.    Lupi further directed and operated the affairs of the Enterprise through subordinates, including upon information and belief, Sixto Delgado, an Uber driver.



*August 2022. Represented by Subin.* **<u>This is Prior Claimant 1, supra.</u>**

95.    When Delgaldo arranged the meeting, Prior Claimant 1's first appointment with Subin Firm with Lupi present, Delgado told her beforehand she would be meeting Lupi there.

> Q.    Did Sixto Delgado ever talk to you about Jorge Lupi?
> A.    He talked to me about the meeting.  He said that we were going to meet in the meeting.  I was going to meet him there.

96.    Sixto Delgado had his own injury lawsuit – with Subin. *See* Index No. 705761/2022; Sixto Delgado v. 50-05 43rd Avenue Corp. et al; Queens County Supreme Court. Subin filed a Consent to Change attorney in the Delgado matter in April 2024. The incoming attorney was defendant Park.

97.    As did his wife – with Subin. *See* Index No. 714769/2023; Zoila E. Obregon Delgado v. 51-15 Van Kleeck Street Associates L.L.C. et al; Queens County Supreme Court.

---

98.    In the matter of Jayson Aristizabal-Rodas, Index No. 719230/2022; Queens County Supreme Court, the Complaint was filed by H. Subin. Without identifying the attorney responding, Subin Firm, at the direction of H. Subin, served an unsigned response to demands on April 17, 2023, indicating Sixto Delgado was a witness.

S I R S:
    Plaintiff, as and for his response to notice for discovery and inspection, by his attorneys, upon information and belief, respectfully allege(s):
    1.    Witnesses: Sixto Delgado; Telephone No.: (929) 395-5239.

99.    In April 2024, Omrani & Taub substituted in. Revised discovery responses were served on September 20, 2024, removing Delgado as a claimed witness.

**DEMAND FOR WITNESSES**
    Plaintiff is not aware of any witnesses at this time. Plaintiff reserves the right to supplement at a later time.

100.    Delgado notably shared an address with the previously listed Richard Loor-Merchan.



101.    Loor-Merchan testified he lived with and had 2 children with "Vismaira Escalona." Sure enough:

---

102.    In October 2022, in the matter of Carlos Enrique Ramirez-Naranjo, Subin Firm

verified a complaint stating that Mr. Ramirez-Naranjo was injured on a job site and suffered

disabling injuries on August 17, 2022, despite the fact Mr. Ramirez-Naranjo never suffered such

injury and no attorney had ever met or spoken with Mr. Ramirez-Naranjo.[3] Subin Firm, in filing

said complaint in furtherance of the Fraud Scheme, *via* the online New York State Courts

Electronic Filing system ("NYSCEF"), committed a violation of 18 USC § 1343 on October 25,

2022.

103.    Concordant with the Fraud Scheme, a workers' compensation claim was started as

well, and Ramirez-Naranjo was attending physical therapy – or rather, *someone* was attending

physical therapy, but it was *not* Carlos Enrique Ramirez-Naranjo. Mr. Ramirez-Naranjo spoke at

length with investigative journalists, and the clinic where PT was purportedly being performed

confirmed, who were able to provide a copy of the ID the person attending was using,  that the

person going to PT with Mr. Ramirez-Naranjo's information was *not* Mr. Ramirez-Naranjo.

---

[3] This is well documented by news coverage here (ABC 7 - "Construction worker says his identity was stolen file false
workers' compensation claim, lawsuit") and here (ABC 7 – "Imposter posed as Queens man for doctor's visits in
'fraudulent' construction fall claim")

104.    It was ultimately verified that an imposter using a phony ID attended the scheduled medical appointments – **with the Subin Firm listed as the imposter's emergency contact and a Subin Firm welcome packet within the imposter's PT file.** Notably, the contact number written on the imposter's documents was for another Defendant:



105.    Mr. Ramirez-Naranjo had been told he was filling out a job application, which was in English (Mr. Ramirez-Naranjo only speaks Spanish) and was told he would receive $15,000 just for filling it out. Sure enough, that check came in the mail – from a litigation finance company, and the "friend" who had filled out the paperwork took $13,000.

106.    An internal source from the Subin Firm later confirmed that the $15,000 came from Best Case Funding, H. Subin's preferred financier owned by a business associate stretching back two decades, and a common Fraud Scheme Enterprise dance partner. The source also initially claimed a "runner" was sent out who Mr. Ramirez-Naranja filled out firm intake paperwork with, and he was then set up with Best Case for funding.

---

**SECOND AMENDED COMPLAINT**

107.    Subin Firm later changed its version of events (news report used the pseudonym "Daniel"):

> We contacted the law firm regarding Daniel's claim that the fall never happened. They told us Daniel signed a retainer agreement and other legal documents with their firm six days after the alleged accident. We tried for months to get the documentation from the firm, but they declined to give it to us or to Daniel himself.

108.    However, Mr. Ramirez-Naranjo had never filled out documents with Subin Firm, nor had he ever been to its office, including six (6) days after August 17, 2022 as claimed - he solely signed the documents presented by his "friend," who was discovered to be Jose Andres Briceno Arias (and who importantly *also does not read or speak English*).

109.    In a separate matter – his own case - Mr. Briceno Arias submitted testimony that the funding company he signed up with (upon information and belief, Best Case) required him to pick up the advance check in person at the Subin Firm office at 150 Broadway, which he did, on July 22, 2022. Upon arrival at the Subin Firm, he met with a Hispanic male in his 30's, who told him he needed to sign a stack of documents in order to receive his check – which was entirely in English (which Mr. Briceno cannot read). Undisclosed in the documents was a form discharge of his current attorney, and a Subin Firm retainer. Mr. Briceno provided an affidavit to that effect on August 22, 2022 (one day before Subin Firm claims Mr. Ramirez-Naranjo came to their office and filled out paperwork), which was included in a motion filed by his fraudulently discharged attorney. Mr. Briceno Arias set forth:

10. Had I known that the papers I was signing were to discharge THE LAW OFFICE OF ELI SHMULIK, and to retain SUBIN & ASSOCIATES, LLP, I never would of done so.

11. I believe I was deceived by the individual described above and effectively coerced into mistakenly discharging THE LAW OFFICE OF ELI SHMULIK PC so that I could continue to receive my litigation funding.

110.    H. Subin controlled the Subin Firm and its prosecution of the Claimants' general liability insurance lawsuits, assigned duties and responsibilities to Subin Firm employees, affiliated WC firms, and Medical Providers, and intentionally submitted or caused the submission of claims and documentation to Accredited, Roosevelt, Tradesman, the NY WCB, and various courts within the State of New York, including verifying pleadings and using or permitting the use of his New York State Central Electronic Filing account to file pleadings and other documents in the general liability insurance lawsuits.

111.    While Subin Firm would often refer out the Claimant's Workers' Comp portion, which were filed and prosecuted by the WC Firms, H. Subin and E. Subin maintained control over those files, including use of support staff who worked for both Subin Firm and the WC firm, and ensured Medical Providers provided the falsified medical documentation to the Subin Firm and WC Firms, who used that documentation to justify the Claimants' falsely inflated claims and lawsuits.

112.    On April 18, 2023, a Subin Firm attorney unintentionally included a page of attorney case notes in a discovery response. Pursuant to the Rules of Professional Conduct, the recipient promptly advised the Subin Firm of the disclosure. However, the damage was done: in the notes was a direct instruction from H. Subin controlling a Claimant's medical care, so as to falsely undermine a scheduled IME, prolong litigation, and manufacture a false credibility issue upon which to impeach the IME provider:

| 12/28/2021 5:55 PM | Hymowitz, Charles M. | We received a letter from Defendant attorney noticing a post 50H exam by Dr. Kim. They are entitled to it pursuant to the statute. Herb wants the client to have an epidural about a week before the exam so that he will be pain free at the exam. Dr. Kim will then use it to say that he was fine and that the surgery (if it happens) is unnecessary. I will reject the NDI. | Attorney Note |

113.    E. Subin, while occasionally functioning in much the same manner as H. Subin, specifically overseeing and directing handling of the Queens County docket, primarily aided, abetted, and facilitated the Fraud Scheme Enterprise by operating as a liaison with both Lupi, *via* telephone calls, text messages, and emails, as well as liaising with the Medical Providers to secure their cooperation and maintain bilateral referral agreements with such Medical Providers.

114.    In March 2023, Sultan Al Maruf sued Subin Firm and Eric Subin in relation to their representation of him in an injury matter.  *See* Index No. 705079/2023; Sultan Al Maruf v. Subin Associates, LLP and Eric Subin; Queens County Supreme Court.  Coming from a *pro se* Plaintiff, the allegations include, *inter alia*, the following entirely consistent claims:

19.    Consequently, Defendant forced Plaintiff to get treatment by Defendant's selected doctors, even though most of them did not take Plaintiff's Medicaid payments. Said doctors billed Plaintiff with their asking price without the insurance company's negotiated price.

23.    Defendant then forced Plaintiff to accept 'Lawsuit Funding' from their selected company when Plaintiff was desperate for money. When Plaintiff wanted to get funding from 'Redwood Funding' that offered 15% apr every 6 months with No compound interest and No fees, Defendant declined to respond and did not sign the documents. However, as soon as Plaintiff agreed to get funding Defendant's selected funding company with insane amount of interest, compounded interest, and insane amount of fees, Mr. Subin immediately signed it.

115.     In letters dated December 8, 2023 and January 12, 2024, another insurer, Ionian Re

LLC ("Ionian), and Andromeda Advantage Inc. ("Andromeda") made the Subin Firm aware it was

of the massive uptick in fraud underway in the New York construction industry pursuant to New

York's Labor Law, and of the disproportionate number of such cases with which the Subin Firm

was associated with.

116.     The January 12, 2024 letter read in pertinent part:

> We are referring to a letter sent to your firm on December 8, 2023, by Ionian RE LLC, a captive insurance program which provides general liability insurance to the construction industry, partnered with Liberty Mutual Insurance.  In that letter, you were informed about a significant increase in claims related to New York State Labor Law § 240/241 (the "Scaffold Law"). The purpose of this communication is to again request that you conduct a more extensive review of your Scaffold Law cases as we have reason to believe there has been some oversight. We urge you to conduct thorough due diligence to verify these claims.
>
> Our records indicate that the highest number of suspected fraudulent cases seem to originate from your law firm, and that no law firm would want such notoriety.
>
> Additionally, we have gathered extensive evidence and data regarding such fraudulent activity and shared this information with law enforcement authorities.
>
> We have advised our legal defense counsel against settling any cases that raise suspicion of fraud, instructing them to seek adjournments when necessary. Additionally, we are also considering the option of filing lawsuits on behalf of the companies.
>
> Once again, we strongly urge you to thoroughly review your filings in order to ensure there has been no oversight.
>
> As you are aware, staged accident claims in the construction industry resulting from criminal activity are costing hundreds-of-millions of dollars, causing harm not only to workers and businesses but also impacting New York City as a whole. The costs of these fraudulent activities are depleting our city's resources and negatively affecting important assets such as bridges, tunnels, schools, hospitals and other infrastructure projects, as well as ongoing construction work within the city and state.
>
> Please take our concerns seriously and address them accordingly.

117.     On March 1, 2024, a civil RICO Complaint was filed in the United States District Court for the Eastern District of New York, Case No. 24-cv-01549- NG-LB.  The defendants in that action have been named for perpetuating a nearly identical fraudulent scheme of using runners and coordinating with medical providers to provide unnecessary treatment, billing records, and unsubstantiated diagnoses to defraud insurance carriers and reinsurers in the State of New York.

118.     Following the issuance of the aforesaid letters and filing of the March 1, 2024 RICO action, the Subin Firm engaged in an unprecedented number of withdrawal motions, often filing executed consents to change attorneys so as to circumvent seeking the courts' permission to be relieved.

119.     The Subin Firm has demonstrated its desire to be relieved in several hundred Labor Law cases, including some of the claims described herein, and thereby disassociate itself from any affiliation to the alleged massive fraud that is associated with those cases and the hundreds of Claimants whom they have represented.  For example:

   a.   As to Claimant A, on or about May 7, 2024, a defendant in the underlying lawsuit moved for leave to amend its answer to assert fraud.  Shortly thereafter, on or about May 21, 2024, the Subin Firm moved to withdraw from that case. The Subin Firm then filed a Consent to Change Attorney, sidestepping the need for Court approval.

   b.   As to Claimant B, on or about March 26, 2024, the Subin Firm moved to withdraw from the underlying lawsuit.  Following the Subin Firm's withdrawal on or about June 27, 2024, Claimant B's lawsuit was dismissed.

   c.   As to Claimant D, on or about March 26, 2024, the Subin firm moved to withdraw from the underlying lawsuit, but the motion was opposed. Following

opposition, the motion to withdraw was denied on or about July 17, 2024.  Only a few days later, the Subin Firm filed a Consent to Change Attorney effectively relieving it of its representation.

d.   As to Claimant E, the Subin Firm has not moved to withdraw or appears to have been relieved as counsel through a Consent to Change Attorney.  However, a different attorney, Karine Bogoraz of the Bogoraz Law Group, P.C., entered an appearance on or about March 28, 2024 on behalf of Claimant E, which was subsequently claimed to be in error.  Subin Firm remains counsel of record; however, it has not made any filings since.

e.   As to Claimant F, the Subin Firm filed a Consent to Change Attorney on or about August 1, 2024 effectively relieving it of its representation.  The law firm substituting the Subin Firm was The Baez Legal Group, PLLC.

120.   On or about November 6, 2024, Defendant Worley appeared as co-counsel with The Baez Legal Group, PLLC.  On April 30, 2025, Worley substituted Baez through a Consent to Change Attorney form, which was notarized by none other than Defendant Hurtado – Lupi's "Office Manager."



121.     Worley has taken over at least forty-two cases from the Subin Firm through Consents to Change Attorney or through picking up dropped cases, as well as picking up at least ten cases from Defendant Park, as demonstrated in the email below with Defendant Hurtado carbon copied. Upon information and belief, these ten cases were originated by Defendants Lupi and Hurtado, and funded by Best Case.

| | |
|---|---|
| **From:** | Jennifer Jara <jjara@mcdonaldworley.com> |
| **Sent:** | Thursday, September 19, 2024 5:26 PM |
| **To:** | Hpark@garyparklaw.com; Gpark@garyparklaw.com; Helen@garyparklaw.com; Valeria@garyparklaw.com |
| **Cc:** | Paulina Hurtado; Personal Injury Team |
| **Subject:** | CTCAs for the following clients |
| **Attachments:** | Carlos armando Guango.pdf; carlos falcones.pdf; carlos once .pdf; Cesar Aguirre Marca.pdf; Cesar Patino.pdf; Edinson Bermudez.pdf; Edinson Plasencio.pdf; Elin Oyuela.pdf; Hilter Labanda .pdf; stalin Nagua.pdf |

Dear Gary Park Team,

Please find attached the CTCAs for the following clients;

1. Carlos Armando Guarango
2. Carlos Lucas Falcones
3. Carlos Once
4. Cesar Aguirre Marca
5. Cesar Patino
6. Edinson Bermudez
7. Edinson Plasencio
8. Elin Oyuela
9. Hilter Labanda
10. Stalin Nagua

Please sign and return the CTCAs for filing and please deliver the client files immediately to us.

Thank you.

122.    Worley has explicitly stated he was retained at the behest of a particular litigation financier, Best Case, owned by long-time Subin-business associate Neal Magnus, who has further done extended business with Lupi.

I have no idea who referred the case to Subin. I have been referred these cases from lenders with outstanding advances to clients.

Have a good weekend,

Don Worley
Attorney At Law
MCDONALD WORLEY, PC
1770 St. James Place, Ste. 100
Houston, Texas 77056
(713) 523-5500

**From:** Don Worley <don@mcdonaldworley.com>
**Sent:** Monday, November 4, 2024 10:15 AM
**To:** Scott Haworth <scott.haworth@hbandglaw.com>
**Subject:** RE: [External] 529407/2023 JORDY RENE GRANDA v. BAYIS NE'EMON INC.

The name of the funder is Best Case Funding.  If you want to send me the outstanding discovery, I can respond and provide the documentation you request.  I will of course make objections because I don't see the relevance of where the plaintiff borrows money just like it is not relevant where the defendant borrows money.

Let me know,

Don Worley
Attorney At Law
MCDONALD WORLEY, PC
1770 St. James Place, Ste. 100
Houston, Texas  77056
(713) 523-5500

123.    As demonstrated *supra*, ¶¶ 102-109, the relevancy discussed in the e-mail above is palpable.

124.    In a hearing on May 16, 2024 in the matter of <u>Carlos Marin v. NYU, et. al.</u>, Index No. 150392/2019, on another return date for an Order to Show Cause to be relieved, Mark Meleka, an attorney employed by Subin Firm, clearly stated a) "**we have a concern with the referral source** that got us the case, and upon the advice of ethics counsel, **we are seeking to be relieved from all cases referred to us by this referral source**," p. 5, and b) later, pp. 17-18:

```
        THE COURT:  Do you know approximately how many

cases, not how many cases you're moving to be relieved in,

but how many cases you're moving to be relieved in because

of this issue?

        MR. MELEKA:  I don't know that off the top of my

head.  I'm sorry, your Honor.

        THE COURT:  Can you approximate?  Are we talking

10?  50?  100?  500?

        MR. MELEKA:  I think it's about 200 to 300, in that

range.

        THE COURT:  Okay, 200 to 300 where there are issues

with the referral source.

        MR. MELEKA:  Solely about the referral source, yes.
```

125.    Subsequently, in <u>Solorzano v. 30 Cooper Square Partnership et al.</u> filed in Queens County New York Supreme Court under Index No. 701227/2021, Leslie Nizen, Esq., an attorney representing the Subin Firm acknowledged in a Court ordered disclosure dated August 7, 2024, that the Subin Firm had received the letters from Ionian and Andromeda, and after consulting with ethics counsel, Subin decided to withdraw from several hundred of such cases in which it was actively involved.

126.    Attorney Nizen further acknowledged that upon advice of ethics counsel the Subin Firm "revealed the least amount of information necessary to provide a basis for withdrawal from the cases."

127.    After an *in-camera* review of documents provided by the Subin Firm, Justice Caloras in the <u>Solorzano</u> matter ordered a hearing to investigate further into the clear scheme to defraud and the Subin Firm's referral source which in all likelihood would be related to the hundreds of matters the Subin Firm sought withdrawal.

128.    At that hearing, the Subin Firm provided the purported name of the suspicious referral source, but the address of the source given was <u>Lupi's address</u>.

129.    In sum, the Subin Firm half-complied in providing partial information as to its referral source, in fact intended to describe its Runner(s) and specifically Lupi, as the reason for its mass withdrawals, and an attorney of the Subin Firm specifically and directly stated to a sitting judge in open Court such withdrawals, in the amount of 200-300 cases, were "solely" due to that reason; when in fact, as its Ethics Counsel set forth on August 7, 2024, there were in fact other, more compelling reasons which Subin strategically omitted – with the referral source information constituting the "least amount of information necessary" for it to take the unprecedented step of walking away from several hundred of cases and claims seeking hundreds of million dollars, and attempting to escape the bed it had knowingly made.

130.    Due to the massive number of motions and the Subin Firm's reference to fraudulent referrals, defendants in underlying matters began to heavily oppose the withdrawals and sought more information to determine the fraudulent nature, if any, of the pending cases at hand.  When the number of oppositions became too great and it appeared that the Subin Firm might be compelled to disclose more information regarding the fraudulent referrals, Consents to Change Attorney, in some instances pre-dating the motion to withdraw, were filed which effectively relieved the Subin Firm of its representation and cut off the disclosure it feared would be compelled.

131.    The Subin Firm's withdrawals, massive and unprecedented as they may be, are performative. The Fraud Scheme continues.

132.    Defendant Worley has, in essence, picked up where Subin Firm left off as to at least forty-two of the Fraud Scheme Enterprise cases performatively jettisoned by Subin firm, as well as at least ten more from Defendant Park.

133.    Each of H. Subin, E. Subin, and Lupi have used the income derived, directly or indirectly, from their patterns of racketeering activity and have used or invested at least part of such proceeds, directly or indirectly, in the establishment or operation enterprises which are engaged in, or the activities of which affect, interstate or foreign commerce.

134.    After receiving the Andromeda and Ionian letters, and post-filing of the initial March 2024 Tradesman Rico action, H. Subin and E. Subin established Subin, LLP and Eric Subin, PLLC. They were both opened on July 10, 2024, a mere nine days before the instant action was filed. They share the same address. Subin, LLP and Eric Subin, PLLC opened a shared case credit line as co-debtors.

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME  **SUBIN, LLP** | | | |
|---|---|---|---|

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS **515 Madison Avenue, 8th Floor** | CITY  **New York** | STATE **NY** | POSTAL CODE **10022** | COUNTRY **USA** |
|---|---|---|---|---|

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION **LLP** | 1f. JURISDICTION OF ORGANIZATION **NY** | | X NONE |
|---|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME  **ERIC SUBIN, PLLC** | | | |
|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS **515 Madison Avenue, 8th Floor** | CITY  **New York** | STATE **NY** | POSTAL CODE **10022** | COUNTRY **USA** |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION **PLLC** | 2f. JURISDICTION OF ORGANIZATION **NY** | | X NONE |
|---|---|---|---|---|---|

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME  **ESQUIRE BANK, NATIONAL ASSOCIATION** | | | |
|---|---|---|---|

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS **100 JERICHO QUADRANGLE, SUITE 100** | CITY  **Jericho** | STATE **NY** | POSTAL CODE **11753** | COUNTRY **USA** |
|---|---|---|---|---|

**4.** This FINANCING STATEMENT covers the following collateral:
**All assets of debtor, wherever located, whether now owned or existing or hereafter acquired or arising, together with all proceeds thereof.**

---

**SECOND AMENDED COMPLAINT**                                   **PAGE 52 OF 116**



135.    Despite the entity names, E. Subin has updated his professional employment with

Courts to reflect employment at Subin, LLC, and has both entered appearance on existing cases,

and opened new ones exclusively in the name of Subin, LLC.

SUBIN, ERIC DAVID on 07/02/2025
SUBIN, LLP

136.    Prior to the filing of this instant action, E. Subin was listed as a leader of the Subin

Firm:



*As of May 19, 2024.*

137.    Subsequent to the filing of this instant action, which identified E. Subin's leadership

role in the Subin Firm, E. Subin was removed from the leadership section:

---

**Leadership**

Search leadership ...








**Herbert S. Subin**
Principal, Lead Trial Attorney

**Gregory T. Cerchione**
Principal, Managing Partner

**Michael Mingino**
Managing Member

**Charles J. Hurowitz**
Managing Member

**Lee Michael Huttner**
Managing Member

**Arnie Baum**
Chief Operating Officer




**Robert Eisen**
Managing Attorney

**Peter May**
Directing Attorney

*As of August 6, 2024.*

138. The purpose of this, upon information and belief, is four-fold: a) conveyance of corporate assets before Subin Firm is inevitably subject to massive judgment or asset seizure; b) fresh corporate books; c) perpetuate the Fraud Scheme Enterprise; and d) conceal E. Subin's involvement in the Fraud Scheme.

139. The above appearance required filing over the wires, itself an act with an impact on interstate commerce, and with the appearances on existing files and opening new ones, the entities have an impact on interstate commerce involving out of state treatment, Claimants, defendants, litigation funders, and medical providers.

140. As the new entity is being used to perpetuate the Fraud Scheme Enterprise and continue the conduct below and above, Plaintiffs have suffered an "investment injury."

141.    Similarly, Lupi has used his Fraud Scheme Enterprise profits to open at least three additional entities, Amedico Legal Network, LLC, Amedico Holdco, LLC, and Amedicolegal Funding, LLC. Lupi has advertised expansion into five (5) states as well.



142.    These entities on their face implicate interstate commerce, and upon information and belief, their purpose is to perpetuate and expand the Fraud Scheme Enterprise, as well as to directly finance fraudulent claims which will increase the number of such claims Plaintiffs are damaged by; Plaintiffs thus have suffered a redressable "investment injury."

**D.    Defendants' Pattern of Racketeering Activity, Damaging Plaintiffs, In Conducting or Participating in the Conduct of the Enterprise's Affairs**

143.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) in that he or she is an individual capable of holding legal or beneficial property interests.

144.    At all times relevant to this Complaint, the Fraud Scheme Enterprise was an association-in-fact within the meaning of 18 U.S.C. § 1961(4), which was engaged in, and its activities affected, interstate commerce. The Enterprise's members share the common purpose of fraudulently exploiting Workers' Comp proceedings and the New York State judicial system, thereby unlawfully enriching themselves through defrauding Plaintiffs and others similarly situated.

145.    As stated above, it did not matter to the Fraud Scheme Enterprise who wrote the checks marking their success on individual Fraud Scheme cases, it only mattered that checks were written. Whoever happened to be holding the checkbook on the individual matters – which would be disclosed through the Workers' Comp proceedings and in the judicial proceedings as a matter of required discovery – were the intended victims of the Fraud Scheme Enterprise. Here, that was Roosevelt and Tradesman. To the degree the name on the paper policy governs despite the above, that would be Accredited (with Roosevelt as subrogee).

146.    Since at least 2018, the Subin Firm has been involved in thousands of lawsuits with attendant workers' compensation proceedings involving purported construction work injuries in furtherance of the Fraud Scheme.

147.    Upon information and belief, the Subin Firm obtained a significant portion of these lawsuits, including those set forth herein, through coordination and with the substantial assistance of its runner Lupi and through the assistance of Defendants Hurtado and Park.

148.    Lupi and Hurtado further coordinated with H. Subin, E. Subin, Medical Providers, litigation funders, and others known and unknown to fraudulently inflate the value of the claims and prolong litigation in furtherance of the Fraud Scheme Enterprise and to the benefit of its members.

149.    Defendants H. Subin and E. Subin, uncle and nephew, are partners at the Subin Firm. At all relevant times, H. Subin directed, authorized, coordinated, and controlled the conduct engaged in by E. Subin, multiple Runners, and other attorney/employees of the Subin Firm, as well as coordinated the Fraud Scheme Enterprise with Lupi, Park, and others known and unknown.

150.    Upon information and belief, at all relevant times, E. Subin, as part owner, partner and senior trial attorney, controlled the Subin Firm and its prosecution of Claimants' claims and lawsuits, in particular in Queens County, assigning duties and responsibilities to employees, WC Firms and Medical Providers, and intentionally submitting or causing the submission of claims and documentation to Tradesman, the NY WCB, various courts within the State of New York and others.  Specifically, lawsuits filed on behalf of Claimants are verified by attorneys also supervised by E. Subin.  As a supervisor and senior trial attorney, E. Subin actively monitors cases and knows the procedural history and facts of each case and either directly or indirectly through subordinates dictate what steps to take in pursuing claims.

151.    Upon information and belief, E. Subin further was the primary liaison between and amongst the members of the Fraud Scheme Enterprise, in particular Lupi through WhatsApp messaging, and certain Medical Providers including weekend trips to the Hamptons and would manage the Fraud Scheme Enterprise relationships *via* email, text, and phone calls.

152.    The pattern of racketeering engaged in by Defendants involved a scheme to defraud and steal from Plaintiff and others, began in or before 2018, and continues to the present day.  This pattern is likely to continue into the future because many claims are still ongoing, and new ones are being opened. Over one-hundred new lawsuits have been filed by H. Subin alone since the start of this lawsuit, Lupi has bragged of expansion into five (5) states, and Worley - with Hurtado's

assistance - are attempting to resuscitate the cases Subin Firm performatively dropped. The Fraud Scheme marches on.

153.    The pattern of racketeering engaged in by the Defendants includes, but is not limited to, the following:

   ***i.  Claimant A***

154.    On or about December 5, 2019, Claimant A was employed as a laborer on a construction site, responsible for the cleaning of debris, when she was allegedly struck by an air conditioning duct while cleaning.

> 6. How did the injury/illness happen? (e.g., I tripped over a pipe and fell on the floor)   *While cleaning, two workers dismantling conditioning duct dropped a large piece that fell on her.*

155.    A witness statement from Claimant A's supervisor for the alleged accident reported that Claimant A was warned that ductwork would be falling, was told to stay clear of the area where work was being performed, but that she intentionally walked under the falling debris and ductwork.

> 7.    While the scaffolders were taking down the ducts, Mrs. Rivera and I were instructed that they were beginning to cut and drop the ducts to stand back away from the area, which we both did.  I did not send Mrs. Rivera to do any other work as the cutting of the ducts usually took 5 to 10 minutes, then we would go in and remove the ducts from the floor after they were cut. We stood back in a far enough area that we would not be in danger of falling debris.

9.    She was instructed multiple times not to go in the area while they were cutting the ducts. Not only was she instructed, but it is common sense that things were falling from the ceiling that you don't want to be under them. After she was struck, we immediately ran over to see if she was okay. There seemed to be bruising on her shoulder, it was sensitive, and we brought her straight to the hospital. I recollect that Mrs. Rivera was out for a few days possibly a week. When she came back for the first week, there was some soreness, and we were providing her with an assistant to help her move things as she was still recuperating. However, after about a week, she no longer needed assistance.

10.    It was my recollection after she returned to work, she worked for over 3 months, where she worked in the same manner and function as she did before the incident on December 5, 2019. In addition, she never complained about the work, and she continued lifting objects of the same weight and size that she was lifting prior to the incident.

156.    On December 5, 2019, Claimant A presented to an urgent care with complaints of left shoulder pain and a headache due to an object falling on her left shoulder at work. She rated her pain at a 5 out of 10 and had a normal BP of 126/80. A physical examination revealed a non-tender back with normal range of motion, and a left shoulder with no swelling or deformity with good range of motion. Claimant A was diagnosed with a left shoulder contusion and referred for a left shoulder x-ray at Lenox Hill Radiology. Claimant A did not complain of any head injuries or loss of consciousness.

157.    While at the urgent care, Claimant A told providers that an aluminum beam fell on her, instead of an air conditioning duct as was later reported to the WCB.

**History of Present Illness:**
Patient presents with left shoulder pain x 1 hr. Patient states were at work cleaning when an aluminum beam fell onto her left shoulder.

158. Despite allegations of debilitating injuries made by the Subin Firm in Claimant's underlying general liability lawsuit, Claimant A continued working until February 11, 2020.

159. Importantly, Claimant A presented the Workers' Compensation Board with an OSHA card which was issued February 1, 2019, several weeks after her alleged accident.

160. In her Workers' Compensation C-3 Form, Claimant A alleged that she suffered injuries to her neck, back, bilateral shoulders, left arm, and right knee.

161. Claimant A commenced chiropractic care on February 11, 2020, with WYQNY Chiropractic with complaints of head, neck, back, left shoulder, and left wrist pain and was given a cervical collar. Claimant A was  seen three to four times a week from the first date of treatment through July 2021. As of October 5, 2022, Claimant A reported no change in her condition despite years of chiropractic treatment.

162. Claimant A commenced physical therapy the next day, on February 12, 2020, with MSH Physical Therapy. While Claimant A complained of left shoulder pain and a headache on the date of the alleged accident, she told MSH providers that she had pain in her neck, back, and bilateral shoulders immediately after the alleged accident.

Patient did not lose consciousness and was not lacerated or vomiting. Patient complains at the time of the accident she felt discomfort, aching and sharp pain at the neck, back, shoulders and has supplemental complaints of sleeping difficulty. [redacted] states that since the date of the accident the overall condition and complaints have worsened.

163. When Claimant A presented to Hudson Pain Associate, PC, on March 18, 2020, she complained of pain to her neck, upper/middle/lower back, bilateral shoulder pain, left wrist pain, and bilateral knee pain.  Claimant A once again changed her version of how the accident occurred and what injuries she sustained. She stated that a large piece of air conditioner duct fell on her back, causing her to fall on both hands and knees.

**HISTORY OF PRESENT ILLNESS:** The patient is a right handed female who reports she sustained an injury during the course of her employment on the above mentioned date. Patient works as a laborer in Alba Construction. The patient states that 2 workers were dismantling an air conditioner duct and a large piece fell on her back, because of the impact, she fell on both hands and knees. The patient went to Midtown New York Doctors Urgent Care the same day of the accident. The patient reports that she did not sustain direct head trauma and did not lose consciousness.

164.    Claimant A was determined to be 100% disabled.

165.    On August 20, 2020, merely eight months after the alleged accident, Claimant A presented for an initial visit to Dr. Scott Katzman of Advanced Orthopedics & Neurosurgery, LLC. Lumbar and cervical MRI reports allegedly revealed L4-L5, L5-S1, and C5-C6 herniations.

166.    At this initial visit, it was determined that Claimant A would undergo both cervical and lumbar fusions due to an alleged failure of conservative treatment.

167.    The cervical MRI performed by CitiMed on May 26, 2020, included in Dr. Katzman's records, revealed that Claimant A had disc bulges at C5-C6 and C6-C7, not herniations as reported by Dr. Katzman.

168.    On January 6, 2021, Claimant A underwent a lumbar fusion of L5-S1 performed by Dr. Steven S. Schiebert of Advanced Orthopedics & Neurosurgery, LLC.

169.    Claimant A presented to Metro Point Medical, PC on May 13, 2021, now claiming that an air conditioning unit fell on her from approximately twenty-five feet resulting in her alleged injuries. ***At the time of this appointment, Claimant A had already undergone left shoulder surgery and a lumbar fusion.***

**History of Present Illness:**
   The patient is a 55y old, right hand dominant female who was injured on 12/01/19, as a result of a work related accident. Patient was on demolition site when an air conditioner fell on her from 25 feet. She fell down sustaining multiple injuries. She was seen in the emergency room where she was evaluated and discharged home the same day. She is S/P left shoulder surgery and lumbar fusion with hardware in place.

170.    Claimant A complained of neck pain, back pain, left shoulder pain, and bilateral pain despite all of the conservative and surgical interventions she had received until this point. Claimant A was to continue with physical therapy and chiropractic care and was recommended to undergo further trigger point injections to the cervical and lumbar spines, despite prior injections being deemed to provide no relief, and a subsequent lumbar fusion.

171.    Claimant A's complaints were evaluated by an Independent Medical Examiner on August 11, 2021, who found that Claimant A's lumbar fusion was performed in conflict with the WCB's Medical Treatment Guidelines, as Claimant A's prior lumbar imaging showed no stenosis or instability warranting a lumbar fusion. This examination also found that the cervical fusion recommended by Dr. Katzman was not medically necessary, as imaging revealed no stenosis, and Claimant A was able to touch her chin to her chest during examination.

172.    Despite independent findings that a cervical fusion was not necessary, Claimant A underwent an anterior cervical discectomy and fusion on January 24, 2022, performed by Dr. Scott Katzman.

173.    Based on Claimant A's medical and workers' compensation records, many of the medical services provided to Claimant A were unnecessary, excessive, and/or unwarranted. For example, *inter alia*, Claimant A received both lumbar and cervical fusions, highly invasive surgeries, despite radiological imaging not supporting surgical intervention.

174.    The Subin Firm submitted or caused to be submitted electronically and/or by mail fraudulent documents to New York State Courts, defense counsel, and the NY WCB that claimed or perpetuated claims that Claimant A had a legitimate accident, injuries and medical treatment with the intent that Plaintiffs and others rely on them as truthful and accurate and to induce them to pay insurance proceeds all in furtherance of the Fraud Scheme.  For the reasons set forth herein,

Claimant A's accident did not happen, the injuries did not exist or were not casually connected to the claimed accident and the treatment was unnecessary, excessive, and/or unwarranted.

175.    On or about December 5, 2019, Defendant Lupi introduced Claimant A to Defendant H. Subin, who together with Defendant Lupi referred the patient to a WC Firm for Workers' Comp handling on or about March 3, 2020, with the agreement that Subin Firm would proceed with the general liability claim but still control the direction of the workers' compensation claim.

176.    By arranging for representation of Claimant A, Defendant Lupi - who by his own admission, has operated "referral services" to injury attorneys since at least 2011 – clearly not only foresaw, but was acutely aware that as a necessary step and in furtherance of the Fraud scheme, certain essential transmissions and mailings *must* occur and will be the necessary result of the introduction of Claimant A to Defendant H. Subin and the referral of Claimant A's case, including a Verified Complaint to initiate a lawsuit. The Verified Complaint filed in Claimant A's case on NYSCEF, making use of the wires in furtherance of the Fraud Scheme on July 8, 2020, was caused to be filed by Lupi through this referral, is a properly alleged substantive violation of 18 U.S.C. § 1343 while conducting and/or participating in the affairs of the Subin Firm. The filing of this document through the wires, as a matter of law, triggered Plaintiffs' opening of the claim and duty to defend and directly caused Plaintiffs' damages arising out of needless legal spending and litigation costs.

177.    The Verified Complaint filed in Claimant A's case on NYSCEF on July 8, 2020, was filed using H. Subin's NYSCEF account. H. Subin, or a party at the direction and with permissive access to his NYSCEF account, in fact made use of the wires to file the Verified Complaint as a necessary step in and in furtherance of the Fraud Scheme in violation of 18 U.S.C.

§ 1343, while conducting and/or participating in the affairs of the Subin Firm. The filing of this document through the wires, as a matter of law, triggered Plaintiffs' opening of the claim and duty to defend and directly caused Plaintiffs' damages arising out of needless legal spending and litigation costs.

178.    H. Subin and Lupi referred Claimant A to various medical providers for purported diagnosis and treatment of alleged medical conditions and purported injuries which resulted from a claimed accident during the course of Claimant A's alleged employment with a construction company.

179.    Claimant A was subsequently assisted by Lupi and others associated or employed by the Subin Law Firm to undergo unnecessary diagnostic and treatment protocols for which they were compensated, including but not limited to surgeries allegedly performed on September 21, 2020, for which Defendant Lupi was identified as the attorney with his Park law firm email.  Upon information and belief, the acts and conduct of Lupi and Park were effectuated in furtherance of the Fraud Scheme and in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering).

180.    On or about November 17, 2020, at the direction of E. Subin and/or H. Subin, a Verified Bill of Particulars alleging facts related to Claimant A's alleged accident, injuries and/or unnecessary diagnostics and treatment was mailed *via* the United States Postal Service to defense counsel in Claimant A's underlying lawsuit, as necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

181.    On or about May 21, 2024, Subin firm moved to be relieved as counsel for the following reason:

14. At this time, SUBIN ASSOCIATES, LLP does not believe it appropriate for it to continue to litigate this matter pursuant to the New York Rules of Professional Conduct.

### ii. *Claimant B*

182. On or about November 29, 2021, Claimant B allegedly fell from a ladder while working at a construction site in New York State.

183. Later that same day, Claimant B presented to Robert Wood Johnson University Hospital via family with complaints of left shoulder, left wrist, and lower back pain due to falling off of a ladder from 4 steps high. Claimant B advised that he was wearing a hard hat at the time of his alleged fall, and he did not complaint of any head of neck pain.

HISTORY OF PRESENT ILLNESS:
BRYAN CABRERA is a 20 YRS-old Male who reports that at work around 12:00 pm today he was 4 steps up on a ladder and slipped and fell falling off. He states that he injured his left shoulder, left wrist, and injuring his lower back. He was wearing a hard hat he did not hit his head he is not complaining of any head or neck pain. Patient has not taken any medication for his symptoms. He is ambulatory without difficulty. Otherwise: (-) acute trauma, (-)

184. A physical examination of Claimant B's neck was *negative* for midline tenderness, paravertebral tenderness, stiffness, and lymphadenopathy. All x-rays of the left shoulder, lumbosacral spine, and left wrist were normal. Claimant B was discharged with a prescription for Ibuprofen and a muscle relaxer.

185. Despite his complaints made in the emergency department, Claimant B presented to Ferry Chiropractic several days later on December 10, 2021, complaining of 9 out of 10 cervical pain, 8 out of 10 thoracolumbar pain, 8 out of 10 left shoulder pain, and 8 out of 10 left wrist pain. He indicated that he was still employed at the time of his visit.

186. The Subin Firm submitted or caused to be submitted electronically and/or by mail fraudulent documents to New York State Courts, defense counsel, and the NY WCB that claimed or perpetuated claims that Claimant B had a legitimate accident, injuries and medical treatment

with the intent that Plaintiffs and others rely on them as truthful and accurate and to induce them to pay insurance proceeds all in furtherance of the Fraud Scheme. For the reasons set forth herein, Claimant B's accident did not happen, the injuries did not exist or were not casually connected to the claimed accident and the treatment was unnecessary, excessive, and/or unwarranted.

187.    On or about November 29, 2021, Defendant Lupi introduced Claimant B to Defendant H. Subin for the purpose of Subin Firm representing Claimant B in a personal injury claim in furtherance of the Fraud Scheme.

188.    H. Subin, together with and in agreement with Defendant Lupi and others known and unknown, induced Claimant B to undergo various diagnostic and treatment protocols for purported diagnosis and treatment of alleged medical conditions and purported injuries which resulted from a claimed accident during the course of Claimant B's alleged employment with a construction company.

189.    By arranging for representation of Claimant B, Defendant Lupi - who by his own admission, has operated "referral services" to injury attorneys since at least 2011 – clearly not only foresaw, but was acutely aware that as a necessary step and in furtherance of the Fraud scheme, certain essential transmissions and mailings *must* occur and will be the necessary result of the introduction of Claimant B to Defendant H. Subin and the referral of Claimant B's case, including a Verified Complaint to initiate a lawsuit. The Verified Complaint filed in Claimant B's case on NYSCEF, making use of the wires in furtherance of the Fraud Scheme on February 1, 2022, was caused to be filed by Lupi through this referral, is a properly alleged substantive violation of 18 U.S.C. § 1343 while conducting and/or participating in the affairs of the Subin Firm. The filing of this document through the wires, as a matter of law, triggered Plaintiffs' opening of the claim and

duty to defend and directly caused Plaintiffs' damages arising out of needless legal spending and litigation costs.

190.    The Verified Complaint filed in Claimant B's case on NYSCEF on February 1, 2022, was filed using H. Subin's NYSCEF account. H. Subin, or a party at the direction and with permissive access to his NYSCEF account, in fact made use of the wires to file the Verified Complaint as a necessary step in and in furtherance of the Fraud Scheme in violation of 18 U.S.C. § 1343, while conducting and/or participating in the affairs of the Subin Firm. The filing of this document through the wires, as a matter of law, triggered Plaintiffs' opening of the claim and duty to defend and directly caused Plaintiffs' damages arising out of needless legal spending and litigation costs.

191.    On March 16, 2024, Subin Firm moved to be relieved as counsel, citing familiar language:

> 11.    At this time, **SUBIN ASSOCIATES, LLP** does not believe it appropriate for it to continue to litigate this matter pursuant to the New York Rules of Professional Conduct.

### iii. *Claimant C*

192.    On or about June 20, 2018, Claimant C allegedly tripped and fell on debris present on a staircase when employed as a laborer at a New York City construction site. In a statement given to the project's safety director, Claimant C stated that she only fell down a single stair due to losing her footing.

> **Statements by Injured Party:** Jennifer, a company laborer, was carrying a garbage pail half full of debris down a flight of stairs and when she got to the bottom step she lost her footing on the last step and fell. Jennifer then accepted an ambulance ride to the hospital and received x-rays for back pain.

193.    Claimant C was transferred to Westchester County Hospital by ambulance and reported that she fell down eight concrete steps, with complaints of right hip, left shoulder, mid back, and neck pain. Bystanders reported to EMS that Claimant C did not lose consciousness. In the emergency department, Claimant C's blood pressure was 110/70 with a heartrate of 80.

194.    Claimant C underwent CTs of the cervical and thoracolumbar spine, which were unremarkable. X-rays of the left shoulder, right hip, and right knee were similarly unremarkable. Claimant C was diagnosed with acute thoracic, lumbar, and neck pain. She was discharged home with prescriptions for Ibuprofen and Percocet and was to follow up with a primary care physician.

195.    Claimant C presented to CitiMed for radiological imaging on June 29, 2018, at the referral of Dr. Imran Ashraf of Hudson Pro Orthopedics & Sports Medicine. A cervical MRI alleged C4-C5 and C5-C6 herniations. A lumbar MRI alleged L4-L5 and L5-S1 disc bulges and a small left L4-L5 foraminal herniation. A left shoulder MRI alleged a partial tear of the supraspinatus tendon with tendinosis and bursal surface fraying[4], and a labral tear. A right knee MRI alleged a vertical tear of the medical meniscus with edema of the superolateral aspect of Hoffa's fat-pad.

196.    Claimant C presented to CitiMed for an initial evaluation on July 16, 2018, with complaints of neck pain, left shoulder pain, left hand pain, left wrist pain, right hip pain, right leg pain, and right knee pain. Claimant C was diagnosed with cervical radiculopathy, lumbosacral sprain with disc displacement, left shoulder rotator cuff tear, right hip synovitis and labral tear, right knee meniscal tear, and left wrist TFCC tear. Claimant C was to undergo physical therapy two to three times a week (which she continued to undergo for the next approximately three years

---

[4] It is well known that bursal fraying is indicative of a chronic condition and is not the result of an acute injury.

who no relief), received a referral to orthopedics and a hand specialist, a pain management doctor for her neck and back, as well as a prescription for a cane. She was determined to be 100% disabled.

197.    On August 1, 2018, Claimant A was recommended to undergo a series of cervical steroid injections by Dr. Raed Hattab of CitiMed. At this time, Claimant A had only been undergoing physical therapy for less than 2 months.

198.    Despite her July 16, 2018 diagnoses, an August 2, 2018 nerve conduction study performed by CitiMed revealed that there was no electrodiagnostic evidence of bilateral L5 radiculopathy or cervical radiculopathy.

**IMPRESSIONS:**
1.  Abnormal study.
2.  There is no eletrodiagnostic evidence of bilateral L5 radiculopathy.
3.  There is no electrodiagnostic evidence of cervical radiculopathy, peripheral neuropathy or carpal tunnel syndrome at this time.



Abdalla I. Adam, M.D. PMR
Diplomat American Board of PMR

199.    Notwithstanding the 2018 findings that there was no evidence of lumbar or cervical radiculopathy, Claimant C continued to undergo treatment to those areas.  Importantly, more than two years after this study, Claimant C was seen by Dr. Katzman for additional treatment to the cervical and lumbar areas.

200.    On January 28, 2021, Claimant C presented to Advanced Diagnostic Group at the referral of Dr. Katzman. Claimant C underwent several radiological studies, including cervical and lumbar MRIs. The MRI reportedly indicated that Claimant C had no herniation C4-C5 and had a disc bulge at C5-C6. Yet, Dr. Katzman relied on this record to state that Claimant C had a disc

herniation at C5-C6 warranting a cervical discectomy and fusion. A disc bulge and disc herniation are markedly different.

201.    On March 16, 2021, Claimant C again presented to Dr. Katzman, at which time it was determined that Claimant C wanted to proceed with a cervical discectomy. Dr. Katzman recommended a cervical discectomy and fusion (which is the same procedure he performed on Claimant A). Claimant C refused to undergo a cervical fusion and cervical disc replacement.

> **SUBJECTIVE:** This patient presents to me in the office with continued complaints of neck pain, numbness, and tingling. As we recall, she injured herself at work. She has a herniated disc. She sustained that herniated disc back in 2018. She has had pain and problems ever since. Recent MRI confirms this herniated disc at C5-C6. She finally wants to have it fixed. I have discussed surgical treatment options for her. The typical treatment for a herniated disc at her level at C5-C6 would be an anterior cervical discectomy and fusion. This would entail removing the entire disc and then replacing it and then placing a plate and screw on it and fixing it. She did not like the description that I gave her for that. She is young. She is only 29 years of age. Alternative options would be to remove the herniated disc, fix the problem, but replace it with an artificial disc replacement. She does have a young child at home. Even though I told her that the recovery time from an artificial disc would be rather quick and brief and she would be able to return to normal activities probably within a few weeks' time, she is still wanting to offer something less invasive and then lastly we discussed just an anterior cervical discectomy.

202.    In the history portion of an Independent Medical Evaluation performed on May 26, 2021, Claimant C reported that she continued to undergo physical therapy 2 to 3 times a week with no improvement from same. She stated the same for the chiropractic care she continually received.

> Please see the prior reports; however, there is a short summary of the record review. At this time, she states her neck is worse and she is receiving physical therapy 2-3 times a week which is not helping. She states she gets no help, even temporary improvement from the therapy. She also has had chiropractic care twice a week and is no better with no temporary improvement. She complains of left shoulder pain if she sleeps on the left side. She now complains of right shoulder pain. She states her low back is worse, is no better with physical therapy or chiropractic care, and massage therapy made it worse.

203.    Claimant C presented to Advanced Ambulatory Surgery Center on August 16, 2021, at which time she underwent the cervical discectomy.  Claimant C also underwent the artificial disc replacement that she previously rejected.

204.    Importantly, the Subin Firm took over Claimant C's case A mere three months prior to her decision in March 2021 to under the highly invasive cervical discectomy.  Prior to retaining the Subin Firm, Claimant C never indicated a desire for any cervical surgery.  Nonetheless, subsequent to the Subin Firm's retention, Claimant C not only agreed to under the cervical discectomy but also the artificial disc replacement she earlier rejected.

205.    The Subin Firm submitted or caused to be submitted electronically and/or by mail fraudulent documents to New York State Courts, defense counsel, and the NY WCB that claimed or perpetuated claims that Claimant C had a legitimate accident, injuries and medical treatment with the intent that Plaintiffs and others rely on them as truthful and accurate and to induce them to pay insurance proceeds all in furtherance of the Fraud Scheme.  For the reasons set forth herein, Claimant C's accident did not happen, the injuries did not exist or were not casually connected to the claimed accident and the treatment was unnecessary, excessive, and/or unwarranted.

206.    At some point prior to January 11, 2021, Defendant Lupi introduced Claimant C to Defendant H. Subin, who together with Defendant Lupi and others known and unknown, induced Claimant C to switch attorneys and undergo various diagnostic and treatment protocols for purported diagnosis and treatment of alleged medical conditions and purported injuries which resulted from a claimed accident during the course of Claimant C's alleged employment with a construction company.

207.    By arranging for representation of Claimant C, Defendant Lupi – who by his own admission, has operated "referral services" to injury attorneys since at least 2011 – clearly not only

foresaw, but was acutely aware that as a necessary step and in furtherance of the Fraud scheme, certain essential transmissions and mailings *must* occur and will be the necessary result of the introduction of Claimant C to Defendant H. Subin and the referral of Claimant C's case, including a Consent to Change Attorney form to proceed with the representation. The Consent to Change Attorney form filed in Claimant C's case on NYSCEF, making use of the wires in furtherance of the Fraud Scheme on January 11, 2021, was caused to be filed by Lupi through this referral, and is a properly alleged substantive violation of 18 U.S.C. § 1343 while conducting and/or participating in the affairs of the Subin Firm. The filing of this document through the wires.

208.    The Consent to Change Attorney form filed in Claimant C's case on NYSCEF on January 11 2021, was filed using H. Subin's NYSCEF account. H. Subin, or a party at the direction and with permissive access to his NYSCEF account, in fact made use of the wires to file the Consent to Change Attorney form as a necessary step in and in furtherance of the Fraud Scheme in violation of 18 U.S.C. § 1343.

209.    Curiously, Defendant H. Subin recorded his representation of Claimant C on October 10, 2020, months before filing his Notice of Appearance and the executed Consent to Change Attorney form.

210.    On or about December 28, 2020, in a necessary step in and in furtherance of the Fraud Scheme, Lucy Hernandez, on Nappa, Monterosso & Poznansky, LLP letterhead, sent an email to the NY WCB enclosing HIPAA authorizations for medical records and C-4/C-4.2 forms for Claimant C and requesting all medical records and C-4/C-4.2 forms to be sent to "Lucy Hernandez at lhernandez@subinlaw.com" or to fax to the attention of "Lucy Hernandez to (646) 652-7037," a number associated with the Subin Firm, in violation of 18 U.S.C. § 1343 (wire fraud).

211.    The submitted C-4 Doctor's Progress Report reported the medical examination of Claimant C by a chiropractor at Sunshine State Medical, Inc. on December 14, 2020. The medical examination was unnecessary but was provided to falsely support and increase the value of the workers' compensation claim and personal injury lawsuit settlement, and Defendants E. Subin and/or H. Subin, or another party employed by or associated with the Subin Firm, caused the medical record to be submitted to the NY WCB. Such submission to the NY WCB, a necessary step in and in furtherance of the Fraud Scheme, was a violation of 18 U.S.C. § 1343.

212.    On or about December 17, 2020, Subin Firm employee Lucy Hernandez, at the direction of E. Subin and/or H. Subin, sent an email to the NY WCB submitting records of medical treatment provided to Claimant C by iRise Spine and Joint on August 24, 2020, a necessary step in and in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. § 1343 (wire fraud). The medical treatment was unnecessary but was provided to falsely support and increase the value of the workers' compensation claim and personal injury lawsuit settlement, and Defendants E. Subin and/or H. Subin caused the medical record to be submitted to the NY WCB in furtherance of the Fraud Scheme.

213.    On or about September 24, 2021, at the direction of E. Subin and/or H. Subin, a Supplemental Verified Bill of Particulars alleging facts related to the alleged accident, injuries and/or unnecessary diagnostics and treatment for Claimant C was mailed *via* the United States Postal Service to defense counsel in Claimant C's underlying lawsuit, as a necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

214.    Claimant C's case remains pending with Subin Firm and H. Subin as Claimant C's attorneys.

### iv. *Claimant D*

215.    On or about August 3, 2022, Claimant D alleged a trip and fall accident while carrying dirt on a construction site in the course of employment for Castcapa Construction at a project located at 1550 Unionport Rd. Bronx, New York.

216.    According to FDNY records, Claimant D was curiously picked up from a location one mile away from the alleged work site.

**Run Type to Scene:**   Emergent (Immediate Response)
**Incident Facility:**
**Incident Location:**   1740 EASTCHESTER RD - Bronx, NY 10461 (Bronx County)



217.    Claimant D's initial complaints at the Jacobi Hospital emergency room were strictly limited to the **right elbow**. Claimant D expressly denied any other injuries to emergency room personnel and was diagnosed with dislocation of the radial head and small avulsion fracture of unknown chronicity.

Denies trauma or pain elsewhere.

Printed by Ramakrishna Saggurthi [30960] at 8/3/2023 5:58 AM

**Narrative History Text:**
43 y/o female fd standing a+ox3 c/o right elbow pain. pt has swelling to right elbow secondary to fall. pt states walking while carrying dirt in a construction site, tripping, falling to ground. pt states happened 1 hour prior to ems pt contact. pt states wearing construction helmet when falling down, hitting head onto ground. pt denies LOC. pt denies any other injuries at this time. applied A-splint to pt right arm in position of comfort. pt states splint helped relax arm in a more comfortable position. pt denies any other injuries at this time. pt denies headache, -dizziness, -nausea, -vomiting, -chest pain, -sob, -fever, -cough. pt txp w/o incident.

218.    Claimant D's account of how her accident occurred, and mechanism of injury evolved into at least three iterations during her initial admission to Jacobi Hospital. First, at the emergency room on August 4, 2022, Claimant D reported walking up stairs and slipped while holding onto a handrail with her left hand, falling on her right side.

**Assessment and Plan:**
43F no PMH. Works in construction.
Walking up stairs, slipped. Holding onto handrail with L hand, fell onto R side.

219.    Second, also on August 4, 2022, Claimant D reported carrying a wheel barrel with rocks up a hill when she fell.

HPI:
_____ is a 43 y.o. female w/o pmhx, mechanism of injury: fall while carrying wheel barrel with rocks up hill. No headstrike, no LOC. Primary survey notable for ABC intact. GCS 15. Hemodynamically stable. Pending Imaging

220.    Third, on August 5, 2022, Claimant D reported a fall from standing while using a wheelbarrow.

**DISCHARGE SUMMARY-TRAUMA**
_____ is a 43 y.o. female admitted on 8/3/2022 from the Emergency Department after fall from standing while using a wheelbarrow. She was admitted for observation and pain control for right anteromedial dislocation of the radial head and small avulsion fractures of the superolateral right acetabulum (of unknown chronicity). Her right upper extremity was placed in a sling and she was able to ambulate with minimal oral pain medications. During admission she was placed on prophylactic lovenox and sequential compression devices for deep vein thrombosis prophylaxis. Upon final evaluation she was afebrile, non-tachycardic, hemodynamically stable, and was treated entirely with oral pain medications. She was able to ambulate and perform ADLs. She requested discharge on 8/5/2022.

221.    During the initial Jacobi admission, Claimant D underwent a closed reduction of the right elbow, which per Dr. Sokol appeared that the "radial head was **recurrently** dislocating in pronation" which was "possibly **chronic** due to deformed appearing radial head."



222.    Claimant D was discharged on August 5, 2022 at 1:58 am.

223.    Per a Worker's compensation C-2 form dated August 25, 2022, Claimant D reported a fourth iteration of events, this time that while employed as a helper for Castcapa Construction on August 4, 2022 (one day after her August 3, 2022 admission to Jacobi emergency room, and in fact while admitted to the hospital, as she was not discharged until August 5, 2022 at 2:25 am) at

---

a jobsite location at 1550 Unionport Road, Bronx, New York she was picking up rubbish on a scaffold when she fell off the scaffold due to rubbish.



224.    Impossibly, **during** Claimant D's admission to Jacobi Hospital in the Bronx, on August 4, 2022, she also presented for an initial evaluation at All Boro Medical Rehabilitation, specifically the 90-20 Elmhurst Avenue Jackson Heights, NY 11372 location in Queens, and curiously was already represented by an attorney, Defendant Subin Firm. **To be clear, Claimant D _was documented in Jacobi Hospital records_ to physically be in the hospital _from August 3, 2022 through August 5, 2022._ The All Boro records are outright fraudulent.**





225.    On November 29, 2022 Claimant D presented to Dr. Sanford Wert and reported a fifth iteration of events this time that she was on a scaffold picking up bricks, when she stepped on a wooden plank that was unsecure and fell through.

> offered by the patient that on 8/3/2022 she was involved in a work related accident. The patient reports being on a scaffold picking up bricks, when she stepped on a wooden plank, that was unsecure and fell through. As a result of the accident, the patient sustained injuries to the right shoulder, right

226.    On December 10, 2022, Claimant D presented to Dr. Ashwin Malhotra, M.D. at Neurodiagnostics Medical reporting a sixth iteration of events this time that she was cleaning a scaffold that was four feet off the ground and there was a door that was not secure on the scaffold, and as she was cleaning she fell through the door, down to the ground.

> states that she was cleaning a scaffold that was 4 feet off the ground. She states that as she was cleaning there was a door that was not secure on the scaffold. As she was cleaning, she fell through the door, down to the ground on her right side. She fell onto her right side and hit the right side of her head on the ground. She sustained injuries to the

227.    The Subin Firm submitted or caused to be submitted electronically and/or by mail fraudulent documents to New York State Courts, defense counsel, and the NY WCB that claimed

---

**SECOND AMENDED COMPLAINT**                                              **PAGE 79 OF 116**

or perpetuated claims that Claimant D had a legitimate accident, injuries and medical treatment with the intent that Plaintiffs and others rely on them as truthful and accurate and to induce them to pay insurance proceeds all in furtherance of the Fraud Scheme. For the reasons set forth herein, Claimant D's accident did not happen, the injuries did not exist or were not casually connected to the claimed accident and the treatment was unnecessary, excessive, and/or unwarranted.

228.   On or about or prior to August 2022, Defendant Lupi introduced Claimant D to Defendant H. Subin who together with Defendant Lupi referred the patient to various affiliated medical providers for purported diagnosis and treatment of alleged medical conditions and purported injuries which resulted from a claimed workplace accident.

229.   By arranging for representation of Claimant D, Defendant Lupi - who by his own admission, has operated "referral services" to injury attorneys since at least 2011 – clearly not only foresaw, but was acutely aware that as a necessary step and in furtherance of the Fraud scheme, certain essential transmissions and mailings *must* occur and will be the necessary result of the introduction of Claimant D to Defendant H. Subin and the referral of Claimant D's case, including a Verified Complaint to initiate a lawsuit. As foreseen and intended, the Verified Complaint was uploaded *via* NYSCEF through H. Subin's account, making use of the wires as a necessary step in and in furtherance of the Fraud Scheme, a substantive violation of 18 U.S.C. § 1343 while conducting and/or participating in the conduct affairs of the Subin Firm

230.   Of note, on the date of accident at Jacobi Hospital, Plaintiff underwent a CT scan of the cervical spine, which was completely negative, not only for any evidence of acute injury or trauma, but for any spinal conditions whatsoever.

> CT Cervical Spine without contrast
>
> Result Date: 8/3/2022
> IMPRESSION: No displaced fracture or prevertebral edema. CLINICAL INDICATION: 43 years old Female Neck pain, acute, no red flags TECHNIQUE: CT of the cervical spine was performed without the administration of intravenous contrast. Coronal and sagittal reformats were obtained. COMPARISON: None. INTERPRETATION: SCOUT: No additional findings. ALIGNMENT: The spinal alignment is maintained. BONES: There is no displaced fracture. DISCS: The intervertebral disk space heights are preserved. EXTRASPINAL: There is no prevertebral soft tissue swelling. The paraspinal and included extraspinal soft tissues are unremarkable. ATTENDING RADIOLOGIST: Gregory Parnes. Final report dictated by   and signed by Gregory Parnes 8/3/2022 11:21 PM

231.    Just three (3) months later, Kolb Radiology, a fixture in Fraud Schemes, claimed the MRI demonstrated large herniations at two levels and a disc bulge, including left greater than right foraminal narrowing at C5-6. Despite the near impossibility of two large herniations developing in three months outside of an intervening event, even Kolb stated there was no spinal instability (listhesis) and a normal spinal cord signal.

> **FINDINGS:  At C2-C3,** there is no disc bulge or herniation.  The neural foramina and exiting nerve roots are unremarkable.
> **At C3-C4,** there is a broad posterior disc herniation impinging upon the thecal sac narrowing the left-sided neural foramen
> **At C4-C5,** there is a posterior disc bulge impinging upon the thecal sac with mild bilateral foraminal narrowing
> **At C5-C6,** there is a broad posterior disc herniation impinging upon the thecal sac with mild left greater than right foraminal narrowing
> **At C6-C7,** there is no disc bulge or herniation.  The neural foramina and exiting nerve roots are unremarkable.
> The discs are of normal height.
> The marrow signal is normal.
> The cord signal is normal.
> There is no fracture .
> There is no listhesis. There is a normal vertebral alignment.

232.    On February 16, 2023, Claimant D underwent an x-ray at a non-Fraud Scheme provider which included flexion and extension views. This test is expressly for testing instability. It found none.

**IMPRESSION**:

Neutral: Moderate to prominent straightening of the lordosis; in neutral head position.

Flexion: Prominent straightening of the curvature  normal AP alignment.

Extension: Moderate straightening of the curvature, normal AP alignment.

No anterolisthesis or scoliosis.

Otherwise, normal spine: intact vertebrae, AP alignment, and disc spaces.

Normal prevertebral soft tissues.

233.    Also on February 16, 2023, Claimant D saw Dr. Pyun at the Gerling Institute for the first time. Dr. Pyun, who is neither board certified in radiology nor a licensed radiologist, further exaggerated and misread Kolb's already exaggerated reading of the MRI, and stated that there were herniations all through C3-6, with cord impingement (MRI: normal spinal signal) and **R>L foraminal stenosis** (MRI: L>R). Dr. Pyun, on this first visit, reviewed the MRI (which itself noted no instability), the x-ray (which confirmed no instability), but not the date of accident CT (which showed no conditions at all). Disregarding **_zero_** evidence of instability, and disregarding the purported C3-4 herniation entirely, Pyun inexplicably recommends an anterior discectomy and fusion at C5-6.

234.    On February 28, 2023, Claimant D had her only visit with Dr. Scott Katzman. He reviews only the MRI (which itself noted no instability), not the recent x-ray (which confirmed no instability), and not the date of accident CT (which showed no conditions at all). **After performing a single objective clinical test** ("Spurling's maneuver positive"), disregarding **_zero_** evidence of instability, and disregarding the purported C3-4 herniation entirely, Katzman **_also_** inexplicably recommends an anterior discectomy and fusion at C5-6 – in conjunction with Dr. Pyun's differentiated diagnosis yet with the same recommendation with the same inconsistency to

diagnostic tests, strongly suggestive of pre-determined outcome for this specific operation. He has

her sign a consent to surgery for same, on the same day, which contained a hint of why this utterly

unjustified surgery was suggested by two different doctors who saw two different things.



235.    Dr. Pyun ultimately performed the anterior cervical discectomy and fusion at

Hudson Regional Hospital five weeks later on March 24, 2023. Notably, significant osteophytes

were alleged to be removed, which showed up on none of the prior studies, and no mention is made

of freed or corrected the purported spinal cord impingement (which pre-op, out of three

radiologists and two surgeons, only Pyun had claimed existed).

236.    On September 29, 2022, at the direction of defendant H. Subin, the Verified

Complaint was filed in Claimant D's case on NYSCEF, making use of the wires in furtherance of

the Fraud Scheme, and was caused to be filed by Lupi through his referral, while conducting and/or

participating in the affairs of the Subin Firm a substantive violation of 18 U.S.C. § 1343.

237.    The Verified Complaint filed in Claimant D's case was filed using H. Subin's NYSCEF account,  filed by or at the direction of  H. Subin, making use of the wires as a necessary step in and in furtherance of the Fraud Scheme in violation of 18 U.S.C. § 1343, while conducting and/or participating in the conduct of the affairs of the Fraud Scheme Enterprise. The filing of this document through the wires triggered Plaintiffs' opening of the claim and legal duty to defend and directly caused Plaintiffs' damages, including needless legal spending and litigation costs to defend against this fraudulent, fabricated accident.

238.    On or about January 18, 2023, Erika Salto, paralegal at the Subin Firm, at the direction of E. Subin and/or H. Subin, mailed a letter on the Subin Firm letterhead, enclosing an executed Workers' Compensation Form OC-110A for Claimant D and requesting a copy of the entire Workers Compensation file by e-mail to esalto@subinlaw.com, in a necessary step in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341 (mail fraud). Defendants E. Subin and/or H. Subin caused the letter to be sent to the NY WCB requesting the workers' compensation file in furtherance of the Fraud Scheme. Upon information and belief, the acts and conduct of the Defendants were effectuated, in part by means of telephone calls, texts, emails and use of the mails, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

239.    On or about May 15, 2023, and January 5, 2024, at the direction of E. Subin and/or H. Subin, a Verified Bill of Particulars and medical records alleging facts related to the alleged accident, injuries and/or unnecessary diagnostics and treatment for Claimant D was mailed *via* the United States Postal Service to defense counsel in Claimant D's underlying lawsuit, as a necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

240.    On or about March 26, 2024, Subin Firm moved to be relieved as counsel, for the following reason:

> 10.    At this time, SUBIN ASSOCIATES, LLP, does not believe it appropriate for it to continue to litigate this matter pursuant to the New York Rules of Professional Conduct.

241.    Not surprisingly, Claimant D's worker's compensation claim was denied as no coverage due to the absence of an employee/employer relationship between the Claimant and the insured construction company Castcapa.

| FULL DENIAL REASONS | |
|---|---|
| Full Denial Effective Date | 8/25/2022 |
| Full Denial Reason | Individual is not an employee of Castcapa |

## *v.   Claimant E*

242.    On or about November 11, 2022, Claimant E alleges that while in course of employment for Dynamic Construction he was involved in an accident at or near 44 Victory Blvd., Staten Island, New York when he fell on his back on stairs while carrying a bathtub on the construction site.

243.    Claimant E's account of how his accident occurred, and mechanism of injury evolved into at least three iterations.

244.    At the emergency room, Claimant E reported that as he was carrying a bathtub **down** a flight of concrete steps, he and his partner fell and landed at the bottom of the steps with the bathtub on top of them.

> emergency room. Patient reports that he was at work and was assisting in carrying a bath tub down a flight concrete steps when him and his partner the ended up falling and landed at the bottom of the steps with the bath tub on top of

245.    On March 18, 2024 to Dr. Alex Chaney of Precision Pain Management, Claimant E's account evolved to carrying a bathtub **up** the stairs when he slipped and fell down three to four stairs, landing on his back.

when on 11/11/22 he was carrying a bathtub up the stairs with a coworker; he slipped and fell down 3-4 stairs landing on his back.

246.    At the Richmond University Medical Center on date of the incident, Claimant E underwent a right ankle x-ray that was negative for acute displaced fracture or dislocation. No soft tissue swelling was noted.

IMPRESSION:
Tarsometatarsal joint is limited in the foot due to positioning. The remainder of the osseous structures demonstrate no gross acute displaced fracture or dislocation

247.    At the Richmond University Medical Center on date of the incident, Claimant E underwent a right knee x-ray that was unremarkable. No soft tissue swelling was noted.

Exam Date: 11/11/2022
Exam Description: XR KNEE 3 VIEWS

FINDINGS: SOFT TISSUES: No soft tissue swelling or gas. No radiopaque foreign body.

BONES/JOINTS: No acute fracture or subluxation.. Normal alignment. Preservation of the joint space.. No sclerotic or destructive changes observed.

IMPRESSION: Unremarkable right knee

248.    At the Richmond University Medical Center on date of the incident, Claimant E underwent a right tibia fibula x-ray that was negative. No soft tissue swelling was noted.

Exam Date: 11/11/2022
Exam Description: XR TIBIA FIBULA 2 VIEWS

FINDINGS: SOFT TISSUES: No soft tissue swelling or gas. No radiopaque foreign body.

BONES/JOINTS: No acute fracture or subluxation.. Normal alignment. Preservation of the joint space.. No sclerotic or destructive changes observed.

IMPRESSION: Negative.

249.    At the Richmond University Medical Center on date of the incident, Claimant E underwent a CT scan of the lumber spine which revealed no evidence of lumber spine injury or fracture.

250.    The Subin Firm submitted or caused to be submitted electronically and/or by mail fraudulent documents to New York State Courts, defense counsel, and the NY WCB that claimed or perpetuated claims that Claimant E had a legitimate accident, injuries and medical treatment with the intent that Plaintiffs and others rely on them as truthful and accurate and to induce them to pay insurance proceeds all in furtherance of the Fraud Scheme.  For the reasons set forth herein, Claimant E's accident did not happen, the injuries did not exist or were not casually connected to the claimed accident and the treatment was unnecessary, excessive, and/or unwarranted.

251.    At some point on or about November 11, 2022, Defendant Lupi introduced Claimant E to Defendant H. Subin, who together with Defendant Lupi and others known and unknown, induced Claimant E to undergo various diagnostic and treatment protocols for purported diagnosis and treatment of alleged medical conditions and purported injuries which resulted from a claimed accident during the course of Claimant E's alleged employment with a construction company.

252.    By arranging for representation of Claimant E, Defendant Lupi – who by his own admission, has operated "referral services" to injury attorneys since at least 2011 – clearly not only foresaw, but was acutely aware that as a necessary step and in furtherance of the Fraud Scheme, certain essential transmissions and mailings *must* occur and will be the necessary result of the introduction of Claimant E to Defendant H. Subin and the referral of Claimant E's case, including a Verified Complaint to initiate a lawsuit. The Verified Complaint filed in Claimant E's case on NYSCEF, making use of the wires in furtherance of the Fraud Scheme on December 30, 2022, was

caused to be filed by Lupi through this referral, is a properly alleged substantive violation of 18 U.S.C. § 1343 while conducting and/or participating in the affairs of the Subin Firm. The filing of this document through the wires, as a matter of law, triggered Plaintiffs' opening of the claim and duty to defend and directly caused Plaintiffs' damages arising out of needless legal spending and litigation costs.

253.    The Verified Complaint in Claimant E's case was filed on NYSCEF on December 30, 2022, using H. Subin's NYSCEF account. H. Subin, or a party at the direction and with permissive access to his NYSCEF account, in fact made use of the wires to file the Verified Complaint as a necessary step in and in furtherance of the Fraud Scheme in violation of 18 U.S.C. § 1343, while conducting and/or participating in the affairs of the Subin Firm. The filing of this document through the wires, as a matter of law, triggered Plaintiffs' opening of the claim and duty to defend and directly caused Plaintiffs' damages arising out of needless legal spending and litigation costs.

254.    Claimant E was subsequently assisted by Lupi and others employed by or associated with the Subin Firm to undergo unnecessary diagnostic and treatment procedures in consideration of promises of compensation, including but not limited to surgery allegedly performed proximate to September 6, 2023, for which Defendant Lupi was specifically identified in the medical records as coordinating treatment and payment.



255.    Despite an entirely negative CT scan of the lumber spine on the date of the alleged accident, on or about August 25, 2023, Claimant E underwent a lumber discectomy performed by Dr. Sebastian Lattuga at Hudson Regional Hospital.

256.    Despite negative, unremarkable radiology of the right knee, leg and ankle on the date of the incident, Claimant E underwent right knee surgery on June 15, 2023 by Dr. McCulloch at New Horizon Surgery Center that was claimed as causally related to the accident.

257.    On or about April 19, 2023, at the direction of E. Subin and/or H. Subin, a Verified Bill of Particulars alleging facts related to the alleged accident, injuries and unnecessary

diagnostics and treatment for Claimant E was mailed *via* the United States Postal Service to defense counsel in Claimant E's underlying lawsuit, as a necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

258.    Claimant C's case remains pending with Subin Firm and H. Subin as Claimant C's attorneys.

### vi. *Claimant F*

259.    On or about December 28, 2020, Claimant F in the course of his employment as a laborer at a construction project located at or near 660 12th Avenue New York, New York alleged a fall from an interior scaffold on the second floor of the work site.

260.    Claimant F's account of how his accident occurred, and mechanism of injury evolved into at least three iterations. First, at the emergency room, Claimant F alleged a fall from five feet and complained of injuries to the right shoulder and right hip, denying other complaints.



261.    An hour later, Claimant F's account to emergency room personnel evolved to a second iteration of his accident now a fall from nine feet.



262.    Claimant F's initial complaints of pain in the right shoulder and hip only warranted a right shoulder x-ray on the date of incident, which was flatly negative.

---

> Impression :
> IMP RES SION:
>
> Negative examination of the right shoulder.

263.     Claimant F was discharged from the Mount Sinai emergency room with a diagnosis of pain in the joint of the right shoulder with a sling and over the counter pain medication, and with **no mention of any neck or back pain** or complaints on the date of the incident.

264.     On December 31, 2020, Claimant F presented to CitiMed with a third iteration of his accident, this time that he was taping a wall on a seven-foot scaffold when he moved, did not see the edge, and fell on his right side.

> Mechanism of injury:    This is a case of [redacted], a 36 y/o left handed male patient who is referred to Physical Therapy with pain on the right shoulder, right elbow, L/S, B/L. hip, left knee after he had work accident on Dec 28, 2020. Patient stated that he is taping a wall using 7ft scaffold when he move and did not see the edge causes him to fell down right side of the body. Ambulance came where they sent him at Mount Sinai Hospital. X-rays were done which revealed normal findings and was given a shoulder splint to wear whenever he felt discomfort or as the pain increase to protect.

265.     At an independent medical examination with Dr. Scott Bienenfeld, M.D. on October 16, 2021, Claimant F reported that he sees a psychologist because **he was told to see one**.

> anxiety. He sees her at most once per month at this point. When I asked him why he sees a psychologist, he states, "I do not know, they told me I should." The claimant lives in

266.     Claimant F was assisted at all times by Lupi, in furtherance of the Fraud Scheme, to undergo unnecessary diagnostic and treatment procedures in consideration of promises of compensation, including but not limited to surgery performed on December 9, 2021, for which Defendant Lupi was specifically identified in the medical records as coordinating treatment and payment.

**International Spine Institute LLC**
SCOTT S. KATZMAN, M.D.
Tel: 855-586-2615    Fax: 973-564-6092

## CONSENT TO SURGERY AND OTHER PROCEDURES

SMART04907V03A148862Code

SACA ALVARADO, ISRAEL (    2/9/1984

JR ADVOCAET: HEATHERVeSR ADOVCATE
VIETVroLUPIVvnWC

To the Patient or Person Legally Responsible for the Patient:   You have the right as a patient to be informed about your condition, the recommended surgical, medical or diagnostic procedures to be used and the risks and hazards so that you may make a decision as to whether or not to undergo the procedure. The disclosure is not meant to scare or alarm you. It is simply an effort to better inform you so that you may give or withhold your consent to the procedure any time prior to its performance.

Request and Consent for Treatment:   I voluntarily request Dr. SLAUGHTER as my physician and such associates, students, technical assistants and other health care providers as my doctor may deem necessary, to treat my condition which has been explained to me as:   _Lumbago with HDP L4-5_

Procedures to be Performed:   I understand the following surgical, medical and/or diagnostic procedures are planned for me:   _Laminectomy Discectomy L4-5 Left with All individual procedures_

I understand that my physicians may discover unforeseen conditions which may require additional for different procedures than those planned.   If such a situation arises, I authorize my physician to perform such other procedures which are deemed appropriate in his/her professional judgment.

Use of Blood Products:   I do / do not (circle one) consent to the use of blood and blood products as deemed necessary.

Received by WCB Fax on 9/29/2021 12:49:40 PM

267.    The Subin Firm submitted or caused to be submitted electronically and/or by mail fraudulent documents to New York State Courts, defense counsel, and the NY WCB that claimed or perpetuated claims that Claimant E had a legitimate accident, injuries and medical treatment with the intent that Plaintiffs and others rely on them as truthful and accurate and to induce them to pay insurance proceeds all in furtherance of the Fraud Scheme.  For the reasons set forth herein, Claimant E's accident did not happen, the injuries did not exist or were not casually connected to the claimed accident and the treatment was unnecessary, excessive, and/or unwarranted.

268.    Claimant F was initially represented in the lawsuit by a different attorney. Upon information and belief, on or around November 9, 2021, Lupi arranged for H. Subin to meet with him and Claimant F for purposes of having H. Subin take over representation and operate the lawsuit portion of the Fraud Scheme. By arranging for representation of Claimant F, Defendant Lupi – who by his own admission, has operated "referral services" to injury attorneys since at least

2011 – clearly not only foresaw, but was acutely aware that as a necessary step and in furtherance of the Fraud scheme, certain essential transmissions and mailings *must* occur and will be the necessary result of the introduction of Claimant F to Defendant H. Subin and the referral of Claimant D's case, including the filing of the required Consent to Change Attorney form. As foreseen and intended, the Consent to Change Attorney form was filed in Claimant F's case on NYSCEF, making use of the wires in furtherance of the Fraud Scheme on February 10, 2022. This transmission was caused to be filed by Lupi as the natural and intended consequence of his conduct and in furtherance of the Fraud Scheme and constituted a substantive violation of 18 U.S.C. § 1343 while conducting and/or participating in the conduct the affairs of the Fraud Scheme Enterprise.

269.    The Consent to Change Attorney form filed on February 10, 2022, filed by H. Subin, or a party at his direction and with permissive access to his NYSCEF account, in fact made use of the wires as a necessary step in and in furtherance of the Fraud Scheme in violation of 18 U.S.C. § 1343, while conducting and/or participating in the conduct of the affairs of the Subin Firm.

270.    Despite the absence of any neck or back injury on the date of incident, and upon the referral of Lupi and H. Subin, on December 9, 2021 Claimant F presented to International Spine Institute a/k/a Mountain Surgery Center where, under the auspices of Dr. Scott Katzman, Dr. Slaughter performed a left laminectomy and discectomy surgery, which, in light of the above, was falsely claimed as causally related to the construction site accident.



271.    Upon information and belief, Lupi initially secured representation for Claimant F's Workers' Compensation proceeding. Lupi further was aware that such representation would necessarily require certain transmissions, including a notice of appearance and a form C-3, to be made to the Workers' Comp Board, as a necessary step in and in furtherance of the Fraud Scheme. On January 6, 2021, as Lupi foresaw, anticipated, and intended, such notice of appearance and form C-3 was transmitted by the confederate firm to the Workers' Comp Board *via* e-mail on January 6, 2021, making use of the wires and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1343.

272.    On or about April 14, 2022, Emily Khywah, paralegal at the Subin Firm, at the direction of E. Subin and/or H. Subin, sent a letter on Subin Firm letterhead, enclosing an executed Workers' Compensation Form OC-110A for Claimant F and requesting a copy of the entire Workers Compensation file by e-mail to ekhywah@subinlaw.com, in a necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

273.    On or about April 25, 2022, Subin Firm, under the direction of E. Subin and/or H. Subin, mailed a Verified Bill of Particulars alleging facts which were known, recklessly indifferent as to the falsity, or should have been known to be false regarding the alleged accident, injuries

and/or unnecessary diagnostics and treatment for Claimant F *via* the United States Postal Service to defense counsel in Claimant F's underlying lawsuit, as a necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

274.    On or about August 1, 2024, Subin Firm filed a Consent to Change Attorney in favor of incoming counsel Baez Law Group, who shortly thereafter, in turn, transferred the case to Defendant Worley, an attorney admittedly referred matters Subin Firm did or intended to drop, by the litigation financier, Best Case Funding (owned by Neal Magnus, an associate of H. Subin for at least two (2) decades).

### vii.  *Claimant Summary and Defendant's Participation in Pattern of Racketeering Activity*

275.    During the course of the representative underlying litigation and workers' compensation claims mentioned herein, the Defendants continuously pressured and coerced Claimants to engage in claims and medical treatment they otherwise would not have and fabricated and transmitted documentation like those mentioned hereinabove containing false information and representations about injuries and medical treatment, which constitutes a combination of mail and wire fraud pursuant to 18 U.S.C. §§ 1341 and 1343 and bribery pursuant to NY Penal Code § 215.05.

276.    The Defendants' actions are alleged to be a part of their ordinary course of business in relation to their employment and affiliation with the Enterprise.

277.    Further, several of the claims detailed herein, and numerous others, are active and ongoing.  Thus, the Defendants' actions outlined constituted a pattern of racketeering activity, the predicate acts engaged in were directly related to the common purpose of the Enterprise, are

representative of Defendants' pattern and course of practice, took place over a period of several years, and are likely to continue into the future unless stopped.

## IV.    PLAINTIFFS' JUSTIFIABLE RELIANCE

278.    Tradesman and Roosevelt (individually and as subrogee of Accredited) are under a statutory obligation to promptly and fairly pay or object to bills received within 45 days. *See* New York Workers' Compensation § 13-5(1).

279.    The invoices and documentation supporting the Fraud Scheme submitted to Tradesman, Roosevelt, Accredited, the NY WCB, the New York Unified Court System, and others, contained materially false statements and were designed to mislead and conceal such materially false statements (and/or otherwise containing material omissions) in violation of New York Insurance Law § 403, New York Penal Law § 176.05 and New York Workers' Compensation Law § 114.  Under such laws, Defendants' conduct as demonstrated herein constitutes fraud.

280.    The Fraud Scheme was designed to and did take advantage of this limited timeframe in which to timely pay or object within 45 days and often submitted multiple bills contemporaneously, further constraining the ability of Roosevelt to object or uncover fraudulent billing.

281.    As to the general liability suits, Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, concealment of material facts, and fraudulent conduct.

282.    As demonstrated above, the mere filing of the subject Complaints in the State Courts mandated an actionable level of reliance – Tradesman had to open and process the claim and Roosevelt was forced to rely on the misrepresentation of the Defendants insofar as the retention of attorneys, investigators, and experts was necessary to avoid default judgments; these

are actions Plaintiffs would not have taken (or had to take) but for the knowing misrepresentations made by the Defendants.

283.    New York law mandates that an insurer's duty to defend is triggered by the filing of a claim or suit - even if the allegations are false or groundless, the insurer has a duty to defend its insured. By law, each and every fraudulent claim and lawsuit immediately and directly triggered mandated expenses by Plaintiffs in discharging their duty to defend its insured.

284.    Each Complaint, Bill of Particulars, bill, lien, and individual medical record created and transmitted by the Defendants, when viewed in isolation, does not reveal its fraudulent nature. Only when the bills and supporting documentation are viewed together as a whole, in conjunction with their repeated use in numerous cases, do the patterns emerge revealing the fraudulent nature of these submissions.

285.    Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiffs, required Plaintiffs to, at minimum, rely on such submissions in incurring further fees and costs in discharging its legal obligation to provide a defense to its insured, resulted in prolonged litigation, required additional reserves, and were relied upon in valuing the claim as to exposure and/or settlement.

286.    As to settlements made as a result of the Fraud Scheme, Plaintiffs at all times conformed with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were

after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

287.    As such, Roosevelt justifiably and reasonably relied on submitted claims as facially valid and was fraudulently induced to direct payment on, at minimum, dozens of claims.  As a matter of claims handling, Tradesman had no choice but to rely on the claim's validity and incur the costs of opening the claim.

288.    Additionally, regardless of truth, falsity, or any descriptor along that spectrum, correspondence was sent *via* mail as well as various transmissions sent over the wires which were performed as necessary steps to and in furtherance of the Fraud Scheme, and as components of an overall scheme or artifice to defraud, or to otherwise obtain money under false pretenses.

## V.    DAMAGES

289.    Plaintiff Roosevelt (individually and as subrogee of Accredited) is a reinsurer which underwrites policies and provides reinsurance that directly and immediately covers, in lieu of the paper insurer, the various workers' compensation claims and personal injury lawsuits filed and prosecuted as a component of the Fraud Scheme. As such, Roosevelt is a party directly and ultimately damaged by the Fraud Scheme.

290.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred expenses paid as part of defending the Workers' Comp claims and indemnity payments thereto, and lawsuits filed and/or prosecuted by the Fraud Scheme Enterprise on behalf of Claimants in furtherance of and as a necessary component of the Fraud Scheme.

291.    But for Defendants' perpetration of the Fraud Scheme, Roosevelt's expenses paid would be measurably less because the Claimants' injuries, if any, would not be inflated and/or manufactured, the medical services necessary to treat any accident-related injury, if any, would be

less significant, and litigation would not be as prolonged, resulting in lower settlement value of such claims and lawsuits and thus, less litigation expenses. In most instances as alleged herein, the incurred costs would have been $0 as it is alleged the claims were entirely fraudulent and should never have been brought.

292.    Such damages further include the payments made as fraudulently inflated settlements in both Workers' Comp and general liability suits due to Defendants' conduct as alleged.

293.    But for Defendants' perpetration of the Fraud Scheme, Plaintiff would not have incurred such damages. Each and every predicate act contributed to the damages incurred, as the scheme is designed to reinforce itself, becoming more difficult to discern, more expensive to combat, and more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire communication, and through reinvestment in the scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for fraudulent scheme.

294.    Further, Plaintiffs' business operations include general liability services from underwriting through claims handling and subsequent administrative and legal actions, including effective handling of personal injury claims. As a direct and foreseeable result of the fraudulent scheme, Plaintiff was obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business.

295.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred general liability claim adjustment expenses progressively rising from $14,020,890.00 in 2018 to $36,362,147.00 in 2019 (159% increase from 2018), to $58,694,694.00 in 2020 (61% increase

from 2019), to $91,334,395.00 in 2021 (56% increase from 2020), and to $142,127,559.00 in 2022 (56% increase from 2021 and 914% increase in four years).

296.    Between 2021 and 2022 alone, Roosevelt's net outstanding liability under general liability reinsurance (to which it paid everything from the first dollar spent as discussed *supra*) increased from $81,267,474.00 to $119,069,641.00, an increase of nearly 47% notwithstanding the COVID-19 pandemic during 2020, which led to the single largest one-year decline for the construction industry in New York City since 1990. *See* Office of the New York State Comptroller, "The Construction Industry in New York City: Recent Trends and Impact of COVID-19," March 3, 2022, at 3. *See* https://www.osc.ny.gov/files/reports/osdc/pdf/report-3-2021.pdf, incorporated herein by reference, last accessed February 15, 2024.

297.    Plaintiff Tradesman serves as a management general agency that provides management services to various insurers and reinsurers, including Plaintiff Roosevelt, including general liability and workers' compensation services from underwriting through claims handling and subsequent administrative and legal actions, specifically focusing on safety management and effective handling of claims within the construction industry.

298.    Tradesman made substantial payments and sustained significant damage in connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the Defendants as part of the Fraud Scheme.  These payments directly resulted in lost profits.  This would not have occurred but for the Fraud Scheme and pattern of racketeering activity described herein.

299.    Defendants' patterns of fraudulent conduct caused injury to Plaintiffs in their business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Plaintiffs to calculate damages with specificity at this stage in the litigation

(whereas Plaintiff's damages continue to accrue), Plaintiffs' injuries include, but are not limited to the following:

    a.    Plaintiff Roosevelt – Actual and consequential damages for the payments (from the first dollar paid) made directly to the Subin Firm, Medical Providers, or others due to Defendants' pattern of fraudulent conduct in connection with claims made under New York's Workers' Compensation Laws and New York's Labor Laws, the exact amount to be determined at trial.

    b.    Plaintiff Tradesman – Actual and consequential damages for the expenses incurred, the lost profits caused by the administration of these claims, and the retention of additional staff (against calculated fixed income not designed to accommodate the essentially admitted at least 200-300 fraudulent cases arising from Subin Firm alone) to perform investigative and support services for claims wherein the Defendants submitted or caused to be submitted claims/demands for monetary payments in connection with New York's Workers' Compensation Law and New York's Labor Laws, the exact amount to be determined at trial.

## VI.    <u>CAUSES OF ACTION</u>

<u>COUNT I</u>
<u>RICO Violation (§ 1962[c])</u>
<u>(As Against Subin Firm, H. Subin, Lupi, and Park)</u>
<u>("Count I Defendants")</u>

300.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

301.    The Fraud Scheme Enterprise was an association-in-fact as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.*

302.    Each of H. Subin, Subin Firm, Lupi, and Park conducted and/or participated in the conduct of the affairs of the Fraud Scheme Enterprise by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future. This conduct included innumerous acts of mail and wire fraud, including the related violations detailed regarding Claimants A-F, *supra*.

303.    Lupi conducted and/or participated in the conduct of the affairs of the Fraud Scheme Enterprise by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future. This conduct included innumerous acts of mail and wire fraud under 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, Money Laundering under 18 USC §§ 1956 & 1957, Bribery under New York Penal Law § 215.00, and unlawful operation of a money transmitting business under 18 USC § 1960, including the related violations detailed regarding Claimants A-F, *supra*, as well as through an incalculable number of additional acts in the same pattern and practice which are within the exclusive knowledge of Defendants which Plaintiffs cannot readily ascertain with discovery.

304.    H. Subin conducted and/or participated in the conduct of the affairs of the Fraud Scheme Enterprise by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the

future. Through managing and coordinating the overarching scheme and prosecuting the fraudulent claims, the alleged conduct included innumerous acts of mail and wire fraud under 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, Money Laundering under 18 USC §§ 1956 & 1957, and Bribery under New York Penal Law § 215.00, including the related violations detailed regarding Claimants A-F, *supra*, as well as through an incalculable number of additional acts in the same pattern and practice which are within the exclusive knowledge of Defendants which Plaintiffs cannot readily ascertain with discovery.

305.     Subin Firm conducted and/or participated in the conduct of the affairs of the Fraud Scheme Enterprise by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future. Through operations of the core elements of the Fraud Scheme, by and through E. Subin, paralegals, attorneys and/or staff, and though other members of the Fraud Scheme Enterprise, the alleged conduct included innumerous acts of mail and wire fraud under 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, Money Laundering under 18 USC §§ 1956 & 1957, and Bribery under New York Penal Law § 215.00, including the related violations detailed regarding Claimants A-F, *supra*, as well as through an incalculable number of additional acts in the same pattern and practice which are within the exclusive knowledge of Defendants which Plaintiffs cannot readily ascertain without discovery.

306.     Park conducted and/or participated in the conduct of the affairs of the Fraud Scheme Enterprise by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future.

Through proactive measures designed to disguise the conduct of Lupi as lawful and innocuous, to provide Lupi the veneer of legitimacy, by prosecuting numerous fraudulent claims in concert with the Fraud Scheme Enterprise, and by handling and distributing the income and proceeds of the Fraud Scheme Enterprise, the alleged conduct included innumerous acts of mail and wire fraud under 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, Money Laundering under 18 USC §§ 1956 & 1957, Bribery under New York Penal Law § 215.00, and unlawful operation of a money transmitting business under 18 USC § 1960, including the related violations detailed regarding Claimants A-F, *supra*, as well as through an incalculable number of additional acts in the same pattern and practice which are within the exclusive knowledge of Defendants which Plaintiffs cannot readily ascertain with discovery.

307.    The pattern of racketeering activity in which Defendants engaged involved numerous specific transactions as described in detail in this Complaint, at least two per Count 1 Defendant with at least one causing Plaintiffs direct and proximate harm, including but not limited to the following predicate acts committed in furtherance of the Fraud Scheme Enterprise, each as a necessary step in the Fraud Scheme, in relation with Claimants A-F: H. Subin's filing of Verified Complaints in violation of 18 USC § 1343, Subin Firm's mailings of Bills of Particulars and case related documents in violation of 18 USC § 1341, Lupi's Travel Act violations under 18 USC § 1952 in arranging and coordinating out of state surgeries, and Park's financial transactions with Lupi designed to conceal the nature, the source, ownership, and/or the control of the proceeds of specified unlawful activity in violation of 18 USC §§ 1956 and 1957.

308.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim involved the transmission and use of false documentation in furtherance of Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers'

compensation claims and lawsuits arising out of fraudulent construction accidents. The remaining alleged predicate acts do not require heightened pleadings under Rule 9(b).

309.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against SUBIN ASSOCIATES, LLP, SUBIN & ASSOCIATES, LLC, HERBERT S. SUBIN, and JORGE ARTURO GONZALEZ LUPI, and each of them, jointly and severally, for:

(a)    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

(c)    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d)    Such other relief as the Court deems just and proper.

## COUNT II
### RICO Violation (§ 1962[d])
### (As against all Defendants)

310.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

311.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Fraud Scheme Enterprise through pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

312.    The substantive 18 USC § 1962(c) violations are set forth in Count 1, including patterns of racketeering by H. Subin, Subin Firm, Lupi, and Park.

313.    Such pattern of racketeering in the conduct or in the participation of the conduct of the Fraud Scheme Enterprise included, but was not limited to, mail and wire fraud under 18 USC §§ 1341 and 1343, Travel Act violations under 18 USC § 1952, Money Laundering under 18 USC §§ 1956 & 1957, Bribery under New York Penal Law § 215.00, and unlawful operation of a money transmitting business under 18 USC § 1960.

314.    These predicate acts were necessary steps in and in furtherance of the Fraud Scheme Enterprise, in meeting the necessary steps agreed upon by the Defendants, including:

    a.  Recruiting Claimants and staging accidents;

    b.  Securing retainer of the attorneys within the Fraud Scheme Enterprise;

    c.  Coordinating and managing Claimants through fraudulent and pre-determined protocol treatments;

    d.  Filing and prosecuting the fraudulent suits and Workers' Comp claims;

    e.  Laundering and concealing the nature of the Fraud Scheme proceeds; and,

    f.  Concealing the nature of the Fraud Scheme itself so as to perpetuate it.

315.    Each Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the Fraud Scheme. At least one conspirator committed overt predicate acts in furtherance of the conspiracy, including the predicate acts alleged in Count 1. Each Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiffs and those similarly situated.

316.    As a direct and proximate result of the § 1962(c) violations that Defendants conspired to commit, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, and attorneys' fees.

317.    Plaintiffs' injuries were the foreseeable and intended consequence of the conspiracy; absent Defendants' agreement and the predicate acts committed in furtherance thereof; Plaintiff would not have suffered the losses described.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

(a)    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

(c)    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d)    Such other relief as the Court deems just and proper.

### COUNT III
### RICO Violation (§ 1962[a])
### (As against H. Subin)

318.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

319.    As set forth in Count I, H. Subin and other Fraud Scheme Enterprise members engaged in a pattern of racketeering activity in the conduct or in the participation in the conduct of the Fraud Scheme Enterprise, from which H. Subin derived income.

---

320.    H. Subin used or invested at least a part of such income, or the proceeds of such income, in establishing Subin, LLP in July 2024.

321.    Subin, LLP has taken over Subin Firm existing cases and has opened additional new cases and operates in substantially similar fashion to the pre-existing Subin Firm.

322.    Subin, LLP continues to operate by and through substantially similar members, conduct, direction, and management of the Fraud Scheme.

323.    The Fraud Scheme Enterprise by and through the newly iterated Subin, LLP has and will continue to cause Plaintiffs harm in substantially similar fashion.

324.    Plaintiffs have an articulable and concrete "investment injury" due to H. Subin's use of proceeds from racketeering activity.

WHEREFORE, Plaintiffs demand judgment against HERBERT S. SUBIN for:

(a)    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

(c)    Injunctive relief enjoining HERBERT S. SUBIN from engaging in the wrongful conduct alleged in this Complaint; and

(d)    Such other relief as the Court deems just and proper.

**COUNT IV**
**RICO Violation (§ 1962[a])**
**(As against E. Subin)**

325.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

326.    As set forth in Count I, Fraud Scheme Enterprise members engaged in a pattern of racketeering activity in the conduct or in the participation in the conduct of the Fraud Scheme Enterprise, from which E. Subin derived income.

327.    E. Subin used or invested at least a part of such income, or the proceeds of such income, in establishing Subin, LLP in July 2024.

328.    Subin, LLP has taken over Subin Firm existing cases and has opened additional new cases and operates in substantially similar fashion to the pre-existing Subin Firm.

329.    Subin, LLP continues to operate by and through substantially similar members, conduct, direction, and management of the Fraud Scheme.

330.    The Fraud Scheme Enterprise by and through the newly iterated Subin, LLP has and will continue to cause Plaintiffs harm in substantially similar fashion.

331.    Plaintiffs have an articulable and concrete "investment injury" due to E. Subin's use of proceeds from racketeering activity.

WHEREFORE, Plaintiffs demand judgment against ERIC D. SUBIN for:

(a)    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

(c)    Injunctive relief enjoining ERIC SUBIN from engaging in the wrongful conduct alleged in this Complaint; and

(d)    Such other relief as the Court deems just and proper.

<u>**COUNT V**</u>
<u>**RICO Violation (§ 1962[a])**</u>
<u>**(As against Lupi)**</u>

332.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

333.    As set forth in Count I, Lupi and other Fraud Scheme Enterprise members engaged in a pattern of racketeering activity in the conduct or in the participation in the conduct of the Fraud Scheme Enterprise, from which Lupi derived income.

334.    Lupi has used his Fraud Scheme Enterprise profits to open at least three additional entities, Amedico Legal Network, LLC, Amedico Holdco, LLC, and Amedicolegal Funding, LLC. Lupi as well has advertised expansion into five (5) states.

335.    Lupi used or invested at least a part of such income, or the proceeds of such income, in establishing Amedico Legal Network, LLC and Amedico Holdco, LLC in April 2024, and Amedicolegal Funding, LLC in 2023, as well as expanding operations into other states.

336.    Lupi, by and through these entities, continues to operate by and through substantially similar members, conduct, direction, and management of the Fraud Scheme.

337.    The Fraud Scheme Enterprise by and through Lupi's new entities has and will continue to cause Plaintiffs harm in substantially similar fashion.

338.    Plaintiffs have an articulable and concrete "investment injury" due to Lupi's use of proceeds from racketeering activity.

WHEREFORE, Plaintiffs demand judgment against JORGE ARTURO GONZALEZ LUPI for:

(a)    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)     Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

(c)     Injunctive relief enjoining JORGE ARTURO GONZALEZ LUPI from engaging in the wrongful conduct alleged in this Complaint;

(d)     Injunctive relief compelling dissolution, complete divestiture, or partial divestiture of Amedico Legal Network, LLC, Amedico Holdco, LLC, and Amedicolegal Funding, LLC pursuant to 18 USC § 1164(a); and,

**(e)**     Such other relief as the Court deems just and proper.

## COUNT VI
## Common Law Fraud
## (As Against H. Subin)

339.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

340.    As set forth above in Counts I and II, H. Subin engaged in myriad material misrepresentations and/or material omissions *via* the Verified Complaints, Bills of Particulars, and other Court filings made in the underlying lawsuits of Claimants A-F, as well as through submissions either filed or knowingly caused to be filed with the New York State Workers' Comp Board with the intent for induce Plaintiffs into payment not justly owed.

341.    These misrepresentations of fact by H. Subin included, but were not limited to, the material misrepresentations of facts made in asserting the legitimacy of accidents, the existence of injuries, and the necessity of treatment.

342.    H. Subin's representations were false or required disclosure of additional facts to render the information furnished not misleading.

343.    H. Subin made these misrepresentations in furtherance of the scheme to defraud Plaintiffs by submitting claims for payment of workers' compensation and general liability insurance benefits.

344.    H. Subin's misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiffs to make payments for claims that were not legitimate.

345.    Plaintiffs reasonably and justifiably relied, to their detriment, on the truthfulness of H. Subin's representations concerning Claimants' eligibility to receive payments of workers' compensation and general liability insurance benefits, and without knowledge of Defendants' scheme and artifice to defraud them.

346.    Further, Plaintiffs were forced to rely on H. Subin's false Complaints and claims as a matter of law in fulfilling their duty to defend such claims, incurring the costs of investigation and defense of such claims.

347.    H. Subin knew, or should have known, that Plaintiffs would so rely on and intended that they so rely on their false representations.

348.    But for H. Subin's misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiffs would not have paid workers' compensation and general liability insurance benefits.

349.    Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that H. Subin was engaged in misrepresentations, omissions, and fraudulent conduct. At all times Plaintiffs engaged in reasonable due diligence through retention of attorneys, experts, and investigators in defending such false claims; the Fraud Scheme is by design intended to mislead and thwart such safeguards.

350.     As a direct and proximate cause of H. Subin's misrepresentations, omissions, concealment of material facts, and his fraudulent course of conduct, Plaintiffs have been damaged. Plaintiffs' damages include, but are not necessarily limited to, benefit payments, administration costs, investigative and defense costs paid by Plaintiffs as a result of H. Subin's conduct.

351.     Because H. Subin's conduct was knowing, intentional, willful, wanton, and reckless, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against HERBERT S. SUBIN for:

(a)     An award of Plaintiffs' actual and consequential damages to be established at trial;

(b)     Plaintiffs' costs, including, but not limited to, investigative costs incurred in the detection of HERBERT S. SUBIN'S illegal conduct; and

(c)     Such other relief as the Court deems just and proper.

### COUNT VII
### Common Law Fraud – Aiding and Abetting
### (As Against Lupi)

352.     Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

353.     Defendant Lupi provided substantial assistance in connection with the Fraud claim set forth under Count IV, in that Lupi recruited the Claimants to participate in the Fraud Scheme, introduced them to the Subin Defendants, secured falsely obtained litigation funding for Claimants, and maintained control and direction of the Claimants' purported medical treatment.

WHEREFORE, Plaintiffs demand judgment against JORGE ARTURO GONZALEZ LUPI for:

(a)     An award of Plaintiffs' actual and consequential damages to be established at trial;

(b)    Plaintiffs' costs, including, but not limited to, investigative costs incurred in the

detection of JORGE ARTURO GONZALEZ LUPI'Sillegal conduct; and

(c)    Such other relief as the Court deems just and proper.

### COUNT VIII
### Unjust Enrichment
### (All Defendants)

354.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

355.    As described above, Defendants conspired to induce Plaintiffs to make or expend numerous and substantial payments to them or others.

356.    The Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

357.    When Plaintiffs paid Defendants and others, Plaintiffs reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Defendants, or those persons working under their control, made concerning Defendants' eligibility to make claims or seek reimbursement under New York law.

358.    Each and every payment that Plaintiffs made or were caused to make to Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Defendants sought and voluntarily accepted.

359.    Throughout the course of their scheme, Defendants wrongfully obtained from Plaintiffs benefit payments as a direct and proximate result of the unlawful conduct detailed above.

360.    Retention of those benefits by Defendants would violate fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

(a)     An award of Plaintiffs' actual and consequential damages to be established at trial; and

(b)     Such other relief as the Court deems just and proper.

### COUNT IX
### Declaratory Relief Pursuant to 28 U.S.C. § 2201

361.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

362.    Pursuant to 18 U.S.C. § 2201(a), the Court may determine the rights and legal obligations of the parties.

363.    There is an actual case and controversy between Plaintiffs on the one hand, and Defendants on the other hand, as to all charges for examinations, treatments, testing, injections, and surgeries that have not been paid to date and through the pendency of this litigation. Plaintiffs contend these Defendants are not entitled to reimbursement for any of these charges.

364.    Because these Defendants have made false and fraudulent statements and otherwise engaged in the fraudulent conduct described above with the intent to conceal, mislead and misrepresent material facts and circumstances regarding each claim submitted, these Defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue.

WHEREFORE, Plaintiffs demand judgment against Defendants for:

(a)     A declaration that Defendants, at all times relevant, have submitted claims and bills to Plaintiffs for staged accidents and unnecessary healthcare services in violation of New York law;

(b)     Declare that Defendants' activities are unlawful;

(c)     Declare that Plaintiffs have no obligation to pay any pending, previously-denied, and/or future workers' compensation or general liability insurance claims submitted by the Defendants; and

(d)     Such other relief as the Court deems just and proper.

## VII.    JURY TRIAL DEMAND

365.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

Dated: July 18, 2025

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By: */s/ William J. Clay*
**WILLIAM J. CLAY**
**MICHAEL A. GRAVES**
**OLIVA KNOTT**
**DANIEL A. JOHNSTON**
**AARON E. MEYER**
1985 Forest Lane
Garland, Texas 75042
Telephone:  214-736-9433
Facsimile:  214-736-9994
Service Email: service@thewillislawgroup.com

***ATTORNEYS FOR THE PLAINTIFFS***
**ROOSEVELT ROAD RE, LTD. AND**
**TRADESMAN PROGRAM MANAGERS, LLC**

cc:  All parties and counsel of record (**via ECF**)